734 A.2d 697

**Christine Ann BENTLEY**

v.

**Alan CARROLL, M.D., et al.**

**No. 116, Sept. Term, 1998.**

Court of Appeals of Maryland.

Aug. 4, 1999.

Paul Victor Jorgensen, Middletown, on brief, for appellant.

Frederick W. Goundry, III (Varner & Kaslick, on brief), Frederick, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RAKER, Judge.

Appellant, plaintiff in a medical malpractice suit in the Circuit Court for Frederick County, appeals from that court's entry of judgment for the defendants, private family health care practitioners in Emmitsburg, Maryland, following a jury verdict in their favor after a nine day trial in December, 1997. Because we agree with Appellant on a number of the issues she has raised, we shall reverse and remand the case to the Circuit Court for Frederick County for a new trial.

## I.

Appellant, Christine Ann Bentley, filed suit against Appellees, Alan Carroll, M.D., Morningstar & Carroll, P.A., and the Estate of George L. Morningstar, alleging medical malpractice by the defendants based upon their purported negligence in failing to prevent the continual, long-term child sexual abuse suffered by Appellant at the hands of persons within her household.[1] The pertinent facts and arguments regarding Appellees' treatment of Appellant which underlie the latter's medical malpractice claims and this appeal are as follows.

Appellees began treating Appellant in March of 1978, when Appellant, then just shy of two and a half years old, was brought by her mother into Appellees' family health care office complaining of frequency of urination, dysuria (painful urination), constipation, and vaginal inflammation. Treating Appellant on approximately twenty occasions over the next ten years, Drs. Carroll and Morningstar acted as Appellant's primary care physicians until 1988, the year Dr. Morningstar passed away. During some or all of this period, Appellant was sexually abused on a regular basis by Luther Burrier, her mother's boyfriend, at times by Etheline Burrier, her mother, and at least once by Luther's nephew. Appellant's chief contention is that Appellees could have prevented the continuation of this abuse had they not been negligent in meeting the standard of medical care at that time, which included a mandatory statutory obligation for physicians to report to social service or law enforcement authorities what they believed, or had reason to believe, constituted child physical or sexual abuse. *See* Maryland Code (1957, 1976 Repl.Vol., 1981 Cum.Supp., 1982 Repl.Vol., 1984 Cum.Supp.) Article 27, § 35A(b)(1), (c), and (d).[2]

---

1. Eastalco Aluminum Co. was also involved as a plaintiff in the suit, attempting to recover monies paid out under an insurance policy for the psychiatric treatment of Appellant. Eastalco, however, is not a party to this appeal.

2. Unless otherwise specified, all subsequent statutory references shall be to Maryland Code (1957, 1976 Repl.Vol., 1978 Cum.Supp.) Article

In contrast, Appellees' core theory is that they met all their obligations under the prevailing standard of medical care required of family health care physicians during the relevant period. Simply put, Appellees argue, they were not negligent. Moreover, any negligence that might be attributed to them was wholly superseded by intervening causes. The abuse and injuries suffered by Appellant were due solely to criminal actions that were neither known nor suspected by the doctors, and that were committed by offenders, the worst of whom, Luther Burrier, Appellees had never met nor were even aware of, and over all of whom the doctors had no control.

In large part, Appellees' medical treatment of Appellant during the critical period from 1978 to 1984 is not disputed by the parties. Recitation of all those details and the related trial testimony and exhibits seems unnecessary for purposes of our analysis. It is worth noting, however, that there was significant factual disagreement at trial concerning whether Dr. Carroll ever (1) evaluated Appellant for sexual abuse and a variety of sexually transmitted diseases, (2) questioned her about being touched inappropriately, (3) inquired into Appellant's childhood and sexual history, (4) conducted a standard, thorough examination, and (5) explained to her mother why he was administering a gonorrhea culture, the method and significance of which were also hotly contested.

The parties do not dispute that the gonorrhea culture was performed in January of 1980 when Appellant was four and a half years old, and that it tested negative. They are in conflict, however, as to the site of the culture sample. Dr. Carroll testified that when he took the sample for the gonorrhea culture from Appellant, her hymen was intact. Admitting that it would be "extremely difficult" to sample the cervix if the hymen were intact, and that it would probably require "an examination under anesthesia to even attempt it" on a

---

27, § 35A. Many sections of this statute, including the reporting requirement alluded to above, have since been re-codified. *See* 1984 Laws of Maryland, Ch. 296; 1987 Laws of Maryland, Ch. 635; Maryland Code (1984, 1999 Repl.Vol.) §§ 5–701 to 5–715 of the Family Law Article.

child of Appellant's age at the time, Dr. Carroll attributed to "clerical error" the fact that the laboratory sheet sent to the Maryland Department of Health along with the cotton swab to be analyzed indicated Appellant's cervix as the culture examination site. Appellant countered that in responding to her pretrial interrogatory as to whether any medical report or like document from the doctors' records contained any inaccuracy, Dr. Carroll stated, "No such contention is made at this time." In addition, Appellant's expert witness, Dr. David Abramson, testified that the condition of a female child's hymen can be a critical factor in determining whether the child has been sexually abused.

As to the significance of the gonorrhea culture, Appellees claim that the negative test result refuted any cause for concern of possible sexual abuse. Appellant asserts that the taking of the gonorrhea culture itself reveals Dr. Carroll's suspicion of abuse, and that the negative result did not rule out, or should not have ruled out, such suspicion.

In addition to these factual disputes, the parties at trial were naturally at complete odds as to whether the Appellees' treatment violated the required standard of medical care, the crux of the case. Specifically contested were whether the doctors believed or had reason to believe Appellant had been or was being sexually abused and, consequently, whether they had a duty to file a report of suspected child abuse with social service and law enforcement authorities. Lastly, disagreement at trial also occurred over several legal issues, namely: Appellees' evidentiary use of a psychological test performed on Appellant by a defense expert witness; Appellant's attempted use of a medical treatise to impeach one of Appellees' expert witnesses; Appellant's attempt to evoke from her expert witness his conclusion regarding the cause of Appellant's recorded medical symptoms prior to age five; and Appellant's prayers for additional and revised jury instructions. The trial court ruled for Appellees on each of these issues. As noted earlier, the jury later returned a verdict in favor of the defendants-Appellees.

Appellant filed a timely appeal with the Court of Special Appeals. On our own motion, we granted certiorari prior to that court's consideration of this case.

## II.

### A. *The Trial Court's Jury Instructions*

### (1) *Denied Jury Instruction on Violation of the Maryland Child Abuse Act as Evidence of Negligence*

In her first assignment of error, Appellant essentially asks that we decide the following question in the affirmative: Did the trial court err in refusing to instruct the jury that violation of a statute may be evidence of negligence and that Maryland's Child Abuse Act, at the time pertinent to plaintiff's suit, required every health practitioner to report the existence of possible child abuse to social service and law enforcement authorities whenever the health practitioner treated a child and believed or had reason to believe the child had been abused? Specifically, Appellant takes issue with the trial court's refusal to give the jury two instructions she proposed regarding Appellees' arguable violation of the Maryland Child Abuse Act, codified during the relevant period under Article 27, § 35A, as well as the legal effect of both a violation and a non-violation of the statute.

Appellant contended at trial that, during the time period pertinent to the present case, § 35A imposed a statutory duty upon Appellees to report the possibility of child abuse in certain circumstances, that the defendant doctors violated that duty in their treatment of Appellant, that their violation of the statute constituted evidence of medical malpractice, *i.e.*, of Appellees' negligent failure to render the standard of care imposed upon their profession, and that a non-violation of the statute did not necessarily preclude a finding of professional negligence.

The statutory duty of physicians to report suspected child abuse stemmed from two subsections of § 35A which in 1978 provided as follows:

## § 35A. Causing abuse to child under eighteen.

\* \* \* \* \* \*

(c) *Persons who shall report abuse, etc.*—Every health practitioner, educator or social worker or law-enforcement officer, who contacts, examines, attends, or treats a child and who believes or has reason to believe that the child has been abused is required to make a report in the form and manner provided in the following subsection, notwithstanding any other section of the law relating to privileged communications....

(d) *Form and contents of report.*—Each such report made pursuant to the provisions of subsection (c) shall be made to the agencies as provided for hereinafter, both orally and in written form; both the reports to be made as soon as is reasonably possible in the circumstances, but, in any case, the written report must be made within forty-eight (48) hours of the contact, examination, attention or treatment which disclosed the existence of possible abuse. The oral report shall be made either by telephone or direct communication to the local department of social services or to the appropriate law-enforcement agency. The agency to which the report is made shall immediately notify the other agency. Nothing however, shall prohibit the local department of social services and the appropriate law-enforcement agency from jointly agreeing to cooperative arrangements. The written report required to be made shall be made in all cases to the local department of social services and a copy sent to the local State's Attorney.

The oral and written reports shall contain the following information, or as much thereof as the person making the report shall be able in the circumstances to furnish:

(1) The name and home address or addresses of the child or children and the parent or other persons responsible for the care of the child or children in question;

(2) The present whereabouts of the child or children if not the same as the home address or addresses;

(3) The age or ages of the child or children;

(4) The nature and extent of the injuries or injury or sexual abuse of the child or children in question, including any evidence or information available to the person or agency rendering the report of previous injury or injuries possibly resulting from abuse or previous sexual abuse;

(5) All such information available to the reporter which would be of aid in establishing the cause of the injuries or injury and the identity of the person or persons responsible therefor.

In order to fully impress upon the jury her theory of the case, which was based in substantial part upon her claim that Appellees violated their duty to report under § 35A, Appellant first beseeched the trial court to include in its charge to the jury the following statement: "The violation of a statute, which is a cause of plaintiff's injuries or damages, is evidence of negligence." MARYLAND INSTITUTE FOR CONTINUING PROFESSIONAL EDUCATION OF LAWYERS, INC., MARYLAND CIVIL PATTERN JURY INSTRUCTIONS § 19:7, at 484 (3d ed.1995) (hereinafter "MPJI 19:7"). Appellant then requested as the first of two "additional proposed jury instructions" that the court follow the MPJI 19:7 instruction with a reading of significant portions of the Maryland Child Abuse Act, as codified in 1978. Included within the proposed additional instruction were subsections (c) and (d) of § 35A exactly as they appear above—except for the headings—along with excerpts from other subsections dealing with the statute's purpose, the definition of terms, and the procedures to be followed as well as the concerns to be addressed after a report has been made.[3] In addition, the penultimate paragraph of Appellant's proposed instruction incorporated the provision of immunity granted to persons making a report in good faith, which appeared in the statute as follows:

---

**3.** In total, the portions of Article 27, § 35A on which Appellant requested the jury to be instructed consisted of the statute's purpose paragraph, six of the definitions from subsection (b), and substantial or complete excerpts from subsections (c), (d), (f), (f–1), (g), and (h).

(h) *Immunity from civil liability or criminal penalty* ....—

(1) Any person, including a health practitioner, educator, or social worker or law enforcement officer, participating in the making of a good faith report pursuant to this section or participating in an investigation or in a judicial proceeding resulting therefrom shall in so doing be immune from any civil liability or criminal penalty that might otherwise be incurred or imposed as a result thereof.

Finally, Appellant's "first additional proposed jury instruction" ended with the following statement:

Should you find that Drs. Carroll and/or Morningstar violated Article 27 Section 35A, if you find their violation to be a cause of the injuries or damages suffered by Ms. Christine Bentley, then that finding of a statutory violation is evidence of that Defendants' negligence.

Appellant also proposed a second additional jury instruction to be read immediately after the first, providing as follows:

Even if you find that the conduct of Drs. Carroll and Morningstar may have complied with Article 27, Section 35A, their compliance with the statute does not necessarily preclude a finding of negligence if you determine, after reviewing all of the evidence, that a reasonable person would have taken precautions beyond the statutorily required measure.

The trial court refused to instruct the jury in any manner as to MPJI 19:7, as to any of the provisions of the Maryland Child Abuse Act excerpted by Appellant, or as to the legal effect of Appellees' violation or non-violation of that statute. In rejecting Appellant's additional proposed instructions regarding these issues, the trial judge stated, "I am persuaded that the standard of care is for the jury to determine, and I believe that should be based on the medical standard of care that's been presented here and not the statute."

Before directly analyzing the judge's rejection of all of Appellant's requested instructions relating to the statute, we shall initially dispose of Appellees' arguments in support of the

court's decision. First, Appellees assert that Appellant "offered no evidence that Drs. Carroll or Morningstar ever violated" § 35A. As the basis for this assertion, Appellees cite only Dr. Carroll's testimony, that he conducted a variety of physical examinations, medical tests, and personal inquiries in treating Appellant, that those interventions confirm that there was "no evidence of any kind of sexual activity going on," and that he never suspected nor had reason to suspect the girl had been sexually abused. Appellees ignore, however, that Appellant contradicted Dr. Carroll's claims through the testimony of several witnesses, including herself, her mother, and her expert witness, Dr. David Abramson, some or all of whom the jury could have deemed credible. In sum, the record itself reveals the fallacy of Appellees' assertion.

■ Appellees next argue that § 35A is inappropriate for purposes of jury instruction in part because it "carries [no] criminal penalty and [is] silent as to civil liability." Understandably, Appellees fail to cite any legal authority in support of this proposition; our research reveals nothing in Maryland precedent requiring that a statute whose violation may be used as evidence of negligence need impose either criminal or civil liability in order to be utilized in such fashion. That statutes typically used for such evidentiary purposes, for instance, provisions of the State's motor vehicle law or utility regulation, may routinely allow for sanction(s) upon their violation is of little, if any, legal significance here. Such an observation certainly does not translate into a rule of law requiring the inclusion of sanctions as a condition precedent to the use of a statute's violation as evidence of negligence.

■ Appellees' contention that instructing the jury on § 35A would have been inappropriate for the additional reason that the statute "was designed not only to protect children who have been the subject of abuse, but also to extend immunity from civil liability or criminal penalty to those who report in good faith" is an argument against itself. For, Appellees fail to recognize that the immunity from liability is granted to those who report, not to those who do not. Indeed,

rather than hiding the statute's immunity provision from the jury, Appellant deliberately included it within her proposed instructions. The evident purpose behind the statute's grant of immunity to good faith reporters is to instigate the exercise of the duty to report; it hardly serves as an excuse for not reporting. Moreover, to the extent that laypersons might commonly experience and expect that physicians render their treatment of patients under a duty of privacy and confidentiality, the instruction on the immunity provision would have directly assisted the jurors in understanding the existence of a duty to report and the ramifications of reporting, particularly the protections provided to physicians who, in filing a report, might appear to a layperson to breach any such confidentiality.

Appellees' alternatively argue that Appellant's proposed instructions were unnecessary and superfluous, because the statutory duty to report was no different than that which was required under the medical standards of care testified to by both sides' expert witnesses. Appellees' equation of the standards as identical is directly nullified, however, by the assertion of their trial counsel during closing remarks that, for a doctor treating child patients in 1978, "[t]here was no standard of care . . . requiring a mandatory reporting [of sexual abuse]. It was simply you had to use your best medical judgment, that's what you were required to do."[4]

---

4. Appellant immediately objected to this remark during Appellees' closing argument, prompting the following bench conference exchange:

[COUNSEL FOR APPELLANT]: This is what I was concerned about, . . . Your Honor, the Court not reading the statute that mandated the reporting. He just told the jury, misrepresented the state of the law that there was no . . .

\* \* \* \* \* \*

There was no mandatory requirement for reporting, that's a lie and he knows it.
THE COURT: [Counsel] I've already ruled on the standard of care . . . we've dealt with this, your objection is overruled.
[COUNSEL FOR APPELLANT]: But that's incorrect, Your Honor.
THE COURT: I've ruled, [Counsel].
[COUNSEL FOR APPELLANT]: I take utmost exception to that—
THE COURT: You've got your exception—

Finally, Appellees postulate that Appellant "could not establish that a violation of the statute was the proximate cause of her injuries." The legal effect Appellees attach to the actual incidents of abuse committed by third-party intentional tortfeasors, as "superceding, intervening torts that broke any possible chain of causation between an alleged violation of [§ 35A] and the harm alleged by" Appellant, essentially denies the legislative purpose and desired beneficial effects of § 35A: to redress previous abuse and to prevent future incidence thereof. The General Assembly's intended goals in enacting the Child Abuse Act, and specifically in imposing a duty on physicians to report suspected abuse, are neither illusory nor fruitless.

Maryland Rule 2–520 addresses jury instructions for civil cases tried in circuit court and provides, in pertinent part, that

> [t]he court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Maryland Rule 2–520(c). This Court has provided guidance to trial courts concerning the considerations to be made in determining whether a particular jury instruction requested by a party should be given. More than a decade ago we stated:

> A party is generally entitled to have his theory of the case presented to the jury through a requested instruction if that theory is a correct exposition of the law and there is evidence in the case which supports it. The test for whether an instruction was proper has two aspects: (1) whether the instruction correctly states the law, and (2) whether the law is applicable in light of the evidence before the jury. If the test is met, the instruction *must* be given.

*Johnson v. State*, 303 Md. 487, 512, 495 A.2d 1, 13 (1985) (citations omitted). *See also Smith v. State*, 302 Md. 175, 179–

[COUNSEL FOR APPELLANT]:—(inaudible) a misstatement of the law.

80, 486 A.2d 196, 198 (1985). More recently, we have restated this test as follows:

> [T]o rule upon the propriety of denying a requested jury instruction, a reviewing court must determine whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.

*Holman v. Kelly Catering,* 334 Md. 480, 495–96, 639 A.2d 701, 709 (1994) (quoting *Wegad v. Howard Street Jewelers,* 326 Md. 409, 414, 605 A.2d 123, 126 (1992)). *See also Jacobson v. Julian,* 246 Md. 549, 561, 229 A.2d 108, 116 (1967) ("So long as the law is fairly covered by the instructions . . . we will not disturb them." (citations omitted)).

Applying the principles of *Johnson* and *Holman* to the present case, we must initially determine whether Appellant's requested instructions were legally accurate. Specifically, is it the law in Maryland, first, that the violation of a statute may be evidence of negligence and, second, that a finding by the jury that Appellees had not violated that statute did not necessarily preclude a finding of negligence?[5]

▪▪▪ Not long ago we reaffirmed that

> [t]his Court has consistently held that the violation of a statutory duty may furnish evidence of negligence. The positive evidentiary value of a statutory violation, however, is subject to the condition that "the person alleging negligence is within the class of persons sought to be protected, and the harm suffered is of the kind which the statute was intended, in general, to prevent."

*County Commissioners v. Bell Atlantic,* 346 Md. 160, 179, 695 A.2d 171, 181 (1997) (quoting *Atlantic Mutual v. Kenney,* 323

---

**5.** The first legal proposition in this question is derived from the last paragraph of Appellant's "first proposed additional instruction" together with MPJI 19:7. The second comes from Appellant's "second proposed jury instruction."

Md. 116, 124, 591 A.2d 507, 510–11 (1991) (other citations omitted)). *See also Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232, 234 (1991) (reiterating that the negligence for which the statutory violation provides evidence is only actionable to the extent it proximately caused injury or damage to the plaintiff). Furthermore, in *Leonard v. Sav–A–Stop Services,* 289 Md. 204, 424 A.2d 336 (1981), we stated that " '[c]ompliance with a legislative enactment ... does not prevent a finding of negligence where a reasonable man would take additional precautions.' " *Id.* at 212, 424 A.2d at 340 (quoting RESTATEMENT (SECOND) OF TORTS § 288C (1964) and citing W. PROSSER, HANDBOOK OF THE LAW OF TORTS 203 (4th ed.1971)). It therefore cannot be denied that MPJI 19:7 and Appellant's reformulation of it with specific regard to the Child Abuse Act correctly stated the law.[6] Appellant's proposed instruction on the legal effect of the jury's finding no violation of the Child Abuse Act by Appellees also accurately reflects Maryland law. Consequently, Appellant was entitled to have the jury instructed as to the substance contained in her requested instructions, as long as the legal propositions therein were applicable in light of the evidence presented at trial.[7]

 In our view, the evidence within the present case was sufficient to trigger the applicability of the Maryland Child Abuse Act and the possible judgment by the jury that Appellees' violation of the duty incorporated therein constituted evidence of negligence.[8] During the relevant time period,

---

6. There is of course no question whether the Child Abuse Act itself was a correct exposition of the law.

7. In the present case this second prong of the *Holman* test for jury instructions essentially addresses the same issues of concern delineated in the prerequisites established by the *Kenney* and *Erie* courts for using a statute's violation as evidence of negligence. The two tests thus merge together into a single inquiry for the case at bar: Was Appellant's incorporation of the Child Abuse Act into her theory of the case probative of the negligence and injuries she claimed, and was the Act applicable in light of the evidence before the jury?

8. We do not believe Appellant to be advocating the implication into the Child Abuse Act of a private right of action. Indeed, at oral argument,

Appellant was a child under eighteen and thus a member of the class intended to be protected by the Act. Moreover, the general injury that she allegedly suffered prior to 1981 and undeniably endured thereafter was child abuse, the very evil against which the legislation was intended to protect.

As to the final requirement of proximate cause, Appellant produced a reasonable, credible theory that a violation by Appellees of their statutory duty to report contributed to the set of circumstances which allowed the perpetrators to continue their sexual abuse of the plaintiff and therefore proximately caused whatever related injuries she endured after the defendants' failure to comply with the law. Such causation could be inferred from the Act's stated purpose for setting into motion the intervention of the State's social service and law enforcement personnel: to redress previous abuse of the reported child while ensuring against any future incidence.[9] In addition, the provisions of the statute detailing the responsibilities of the respective state agencies triggered by a report of suspected child abuse, *see* § 35A(f)–(i), could likewise have generated or reinforced the inference that Appellees' failure to fulfill the duty to report resulted in continued abuse. Along these lines, Appellant had presented testimony from Peggy

---

Appellant seemingly admitted that Appellees could be held liable only if there exists proof of negligence beyond their failure to comply with the statute. We note, in any event, that the current case law governing tort claims in Maryland courts views the rule that the violation of a statute is evidence of negligence strictly as a rule of evidence, and not as a rule of substantive law implying a cause of action within any given statute relied upon for such evidence. *See Fisher v. O'Connor's, Inc.,* 53 Md.App. 338, 342, 452 A.2d 1313, 1315 (1982).

9. The purpose paragraph of Article 27, § 35A, which Appellant had included as part of her "first additional proposed jury instruction," provided as follows:

*Purpose.*—The General Assembly hereby declares as its legislative intent and purpose the protection of children who have been the subject of abuse by mandating the reporting of suspected abuse, by extending immunity to those who report in good faith, by requiring prompt investigations of such reports and by causing immediate, cooperative efforts by the responsible agencies on behalf of such children.

Walter, a child protective service worker with the Frederick County Department of Social Services, who explained in great detail the practices and procedures implemented by her office, in combination with local police authorities, whenever a report of suspected child abuse was filed during the years between 1978 and 1984. The "overriding goal" of this combined intervention was to ensure the "safety of the child." Therefore, under Appellant's theory of the case and presentation of evidence, the jury could reasonably have found the required element of causation to have been adequately proven.

With regard to the last prong under *Holman,* the instructions actually given by the trial court did not fairly cover the substance of the issues validly presented by Appellant for consideration by the jury. Indeed, as noted earlier, the court refused to instruct the jury in any manner whatsoever as to these statutory matters. Perhaps most egregious was that the jurors in this case were in no way instructed by the trial court as to the obligation of physicians to report suspected child abuse, whether couched as a statutory duty or a professional requirement. To the extent it places a statutory reporting duty on physicians, the Maryland Child Abuse Act, now contained in the Code in large part within the Family Law Article, §§ 5–701 to 5–715, is thus incorporated as part of the general standard of care expected of and within the medical profession in the treatment of child patients.

While we do not decide exactly how much of or in what manner Appellant's requested instructions ought to have been given, we hold that the trial court was obligated in the instant case to instruct the jury in some manner as to the legal propositions that (1) Maryland statutory law, during the relevant period, required every physician who treated a child and believed or had reason to believe that the child had been abused was required to make a report as to the existence of such suspected abuse to the local department of social services or to the appropriate law enforcement agency, which would then investigate and intervene to the extent necessary to redress prior abuse and prevent future occurrences and (2) the violation of such a statute by a physician constitutes

evidence of negligence. Appellant was additionally entitled to have the jury instructed that the statute provided immunity to a physician who in good faith reported suspected sexual abuse of a child patient and that any non-violation of the statute by Appellees did not necessitate that they were not negligent. We therefore hold that the trial court erred by refusing to instruct the jury pursuant to Appellant's requests relative to those issues.[10]

Whereas we remand the present case to the circuit court for a new trial based upon its error in charging the jury, we deem it appropriate to address several of the other issues raised by Appellant in order to guide both the parties and the trial court should the same issues resurface upon retrial. *See Ware v. State*, 348 Md. 19, 55, 702 A.2d 699, 716 (1997); *Foster v. State*, 297 Md. 191, 215, 464 A.2d 986, 999 (1983).

### (2) *Jury Instruction on Determination of Causation Based Solely on Expert Testimony*

Appellant asserts that the trial court made a second error in its instructions to the jury, one of commission rather than omission, and poses the following query: Did the trial court err in twice charging the jury, over plaintiff's objections, that it must make its judgment as to whether plaintiff's claimed injuries were caused by the alleged negligence of defendants only on the basis of expert medical testimony

---

10. We leave any other matters contained within Appellant's proposed instructions to the judgment of the trial court presiding over any retrial of the present case. Nevertheless, we note that the particular jury instructions requested by Appellant probably should not have been given in the form presented; rather, the court should have crafted its own instructions adequately addressing the issues raised by Appellant that were appropriate for the jury's consideration. *See Gunning v. State*, 347 Md. 332, 350, 701 A.2d 374, 382–83 (1997) ("It should ... be noted that a trial judge is under no obligation to use the precise language suggested by counsel in submitting an instruction. The fact that counsel's formulation accurately states the law does not preclude the court from fashioning its own instruction, provided that the judicially crafted instruction is accurate and 'fairly covers' the requested instruction." (citations omitted)).

which speaks in terms of reasonable probability or reasonable certainty?

The trial court included in its charge to the jury an instruction derived almost verbatim from one proposed by counsel for Appellees, which stated:

> In considering the question of whether the alleged negligence of the Defendants was the cause of the injuries of which the Plaintiffs now complain, *you must form your judgment only on the basis of expert medical testimony* which speaks in terms of "reasonable probability" or "reasonable certainty." Your decision may not be based on expert testimony that admits of a mere possibility of negligence, or a mere possibility that such negligence caused the injury. [Emphasis added.]

At the close of the court's charge to the jury, counsel for Appellant immediately objected to this particular instruction, arguing:

> I believe there was an instruction that the jurors should only consider expert testimony that was stated in the form of reasonable medical probability in determining whether or not there was a cause of the injuries. And the problem I'm having with that is that other evidence is certainly appropriate to be considered in addition to expert testimony. Now I don't have a problem with an instruction that expert testimony needs to be stated in order to be evidence to a reasonable degree of medical certainty, but I do have a concern with the Court's instruction on that element there because it's suggesting that the plaintiff has an obligation to produce expert testimony stated within a reasonable degree of medical probability in order to demonstrate causation. And respectfully, we would submit that the evidence to demonstrate that can include non-expert testimony or it can include expert testimony, it's up to the jury to determine whether the evidence that's submitted is sufficient to find causation, whether it be proximate cause or direct cause. So that is my objection to that particular instruction, Your Honor.

In response to Appellant's objection, the trial court decided "to re-read that instruction, modifying it by deleting that second [sentence]. ..." Thereupon, Appellant reiterated her protest, contending that the court's proposed solution failed to dispel her dissatisfaction with the original instruction:

> The problem I'm having, even deleting that sentence, it still makes it sound as if they have to form their judgment based only on the basis of expert medical testimony. And my problem is ... that obviously there's a lot of other evidence besides expert medical testimony in the case. And so I think that needs to be clarified, something needs to be added to it, that says ... you should consider only expert medical testimony which speaks in terms of reasonable probability or reasonable certainty, along with any other evidence that is not from an expert that you deem appropriate.

With its instruction in the instant case the trial court improperly restricted the jury in its determination of causation to the bare consideration of three witnesses' testimony, thus wiping out all the other voluminous evidence admitted at trial—in the form of interrogatories, depositions, live testimony and exhibits—as provided by both Appellant and Appellees. In particular, the testimony of the plaintiff patient and the defendant doctor in the present case might undoubtedly have some evidentiary value relative to causation. To the extent that the court's instruction rendered all non-expert evidence irrelevant to the issue of causation, the jury was misguided in its task, and the court erred. *See Singleton v. Roman*, 195 Md. 241, 247, 72 A.2d 705, 707 (1950) ("[A]n instruction is erroneous if it withdraws from the consideration of the jury any evidence, however weak, tending to establish material facts." (citation omitted)). This is particularly true in light of the oddity that, as to causation, the only evidence left to the jury by the court's single instruction on the issue—the expert opinion testimony—necessarily derived its probative force from the very evidence the court had excised from the jury's review. *See State Health Dep't v. Walker*, 238 Md. 512, 520, 209 A.2d 555, 559 (1965) ("An expert opinion derives its

probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert." (citation omitted)). Because the court's instruction that the jury consider only expert medical testimony in determining the cause of Appellant's injuries misrepresented the law in Maryland, it was error for the trial court to instruct the jury as it did in the present case. *See Kennelly v. Burgess*, 337 Md. 562, 572, 654 A.2d 1335, 1340 (1995) ("[T]he instruction given was an improper statement of the law and was therefore error.").

## B. *The Trial Court's Evidentiary Rulings*

### (1) *Use of the Minnesota Multiphasic Personality Inventory as Evidence of Plaintiff's Exaggeration of Complaints for Litigation Purposes*

■ Appellant has also assigned error to the trial court's refusal to strike testimony from a defense expert witness in psychiatry that his testing of the plaintiff by use of the Minnesota Multiphasic Personality Inventory demonstrated that she had exaggerated her complaints for purposes of litigation. Appellant argues that the trial judge erred as a matter of law by refusing to strike the testimony of defense expert witness, Dr. John Henderson, that the plaintiff had exaggerated her complaints. We agree.

In presenting their defense, Appellees called Dr. Henderson, a forensic psychiatrist practicing in Baltimore, who prior to the trial had conducted a mental-status exam of Appellant, during which he administered the Minnesota Multiphasic Personality Inventory (MMPI) upon her. The MMPI is a widely used psychological test designed to measure ten general possibilities for abnormality in psychological function. The test consists of approximately 560 questions, each calling for a true or false response. The MMPI has several built-in validity scales, designed to determine the extent to which the test is accurately measuring the traits it purports to measure and to help detect whether the taker is attempting to lie or

appear in a falsely virtuous light. *See People v. Stoll,* 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698, 704 (1989).[11]

Dr. Henderson concluded from his examination and the results of the MMPI that Appellant displayed no clinical indication that she was afflicted with either the depression or post traumatic stress disorder from which she claimed to be suffering. Testifying as an expert at trial, however, Dr. Henderson did not limit his testimony to announcing this conclusion to the jury. Instead, despite Appellant's motion in limine to exclude any testimony by the doctor that might impugn her credibility as a witness, the trial court permitted Dr. Henderson to describe the MMPI to the jury as a test that "gives you a profile of the validity and the consistency of the individual answering it, sort of, I hate to use the word, mini truth, or lie detector, truth detector." Despite his professed discomfort with his characterization of the MMPI, Dr. Henderson went on to advise the jury that his testing of Appellant revealed a "frequency of unusual, bizarre complaints endorsed by the patient on the test." Thus, the doctor informed the jury, "What this represents is that there's an extreme exaggeration of unusual complaints."

The doctor, however, had not yet finished his attack on the veracity of Appellant and her claims. In replying to defense counsel's request for his opinion as to the precise form of Appellant's exaggeration, Dr. Henderson stated, in part, "Now what's important here is there's exaggeration of emotional difficulties.... This is a pattern in the validity scales that is seen predominantly in litigation involved patients." Counsel for Appellant at this point immediately requested the court to strike Dr. Henderson's "last comment" as "totally inappropri-

---

11. The validity scales of the MMPI, included to alert the examiner to the possibility that the subject is faking the responses, have been described as the "L" scale, designed to measure overt lying; the "K" scale, designed to measure more subtle deception; and the "F" scale, designed to measure exaggeration. *See Brown v. State,* 736 P.2d 1110, 1114 (Wyo.1987). During his testimony in the present case, Dr. Henderson briefly explained these validity scales to the jury, and characterized them as exhibiting a "validity pattern in terms of how the individual took the test."

ate," pointing out that "the Court of Appeals has made it clear that a psychologist is not a lie detector ... who takes away from the jury its responsibility, it doesn't matter what testing he's using, we don't have polygraphs in the courtroom." The court denied Appellant's request, concluding that "this test is measuring the truth, not for my purpose of truth, [but] the honesty of the individual while taking the test.... And your recitation of the law is correct, but it doesn't apply here."

This Court has repeatedly reaffirmed that courts in Maryland are improper fora for the introduction and interpretation of "lie detectors," "polygraphs," or any like measurement of a witness's veracity. *See Guesfeird v. State*, 300 Md. 653, 658, 480 A.2d 800, 803 (1984) (reiterating firm rule that polygraph tests are not admissible, including fact of taking such a test). Our resistance against admitting evidence of lie detection applies equally where human beings are the fount of such testimony:

> We have not recognized that a witness may be a more reliable lie detector than a polygraph machine. We have never indicated that a person can qualify as an "expert in credibility," no matter what his experience or expertise. We have insisted that, in a jury trial, the credibility to be given a witness and the weight to be given his testimony be confined to the resolution of all of the jurors. It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law.

*Bohnert v. State*, 312 Md. 266, 278, 539 A.2d 657, 663 (1988). *See also Hutton v. State*, 339 Md. 480, 503, 663 A.2d 1289, 1300 (1995) ("[N]o matter how learned in his or her field of expertise, no expert is in a better position to assess the credibility of a witness than is the jury.")

Reviewing the testimony in context, we conclude that the witness went beyond a mere expression of opinion as to the plaintiff's "honesty ... while taking the test." Moreover, Dr.

Henderson's reference to the MMPI as a "mini-truth, or lie detector" was inadmissible, highly inflammable and prejudicial. Even if the testimony regarding the MMPI test results were admissible in evidence for another valid purpose, we hold that as presented in this case, the evidence should have been excluded and the trial judge should have granted the motion to strike.

### (2) *Expert Witness's Opinion as a Vouch for the Credibility of Plaintiff's Testimony*

█ In her final claim of error,[12] Appellant requests us to consider whether the trial court erred or abused its discretion by disallowing testimony from plaintiff's expert witness as to the cause of plaintiff's medical condition at the age of thirty-one months on the basis that such testimony would improperly vouch for the credibility of the plaintiff's anticipated testimony, disputed by the defense, that she was being sexually abused during that period of her life. Appellant contends that the trial court abused its discretion in excluding expert opinion testimony by Dr. Abramson that the cause of Appellant's medical complaints to Appellees prior to ages five or six was sexual abuse, the possibility of which the defendant doctors were negligent in not recognizing and reporting. We hold, however, that the trial court did not abuse its discretion.

In the trial below, the court precluded Dr. Abramson's proposed testimony that, in his opinion, the cause of Appellant's symptoms between 1978 and 1980, as reported to and treated by Appellees during her first seven visits to their offices, was sexual abuse. The judge reasoned that such testimony would improperly vouch for the credibility of Appellant's anticipated testimony, disputed by the defense, that she

---

**12.** Appellant raised one other issue on appeal, namely, whether the trial court erred or abused its discretion by refusing to allow plaintiff to impeach a defense expert witness with statements from a published treatise where the same witness's testimony indicated that the treatise was recognized as a reliable authority by others in his field. Because this issue was fact-intensive, in light of our reversal based upon other issues, we shall not address it.

was sexually abused prior to 1981, or prior to the ages of five or six.

In *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988), we considered the trial court's admission of expert opinion testimony adduced by the State that the complainant in a criminal trial "was, in fact, a victim of sexual abuse." *Id.* at 271, 539 A.2d at 659. We held not only that under the circumstances of that case was admitting the opinion in evidence an abuse of the trial court's discretion because of insufficient foundation, but also that such testimony was inadmissible as a matter of law because of its improper impact upon the jury's assessment of the credibility of both the complainant and the defendant. *Id.* at 277, 539 A.2d at 662. Appellant's proposed expert opinion testimony in the present case would suffer from the same legal flaws as the evidence erroneously admitted in *Bohnert*. Just as in *Bohnert*, the proffered expert opinion in the present case could not be admitted as a matter of judicial discretion given that the underlying, non-testimonial evidence could not support the conclusion sought by Appellant's counsel, nor could the opinion be admitted as a matter of law to the extent that any reliance by Dr. Abramson upon Ms. Bentley's recollection of events of abuse prior to 1981 would necessarily vouch for the credibility of her testimony.

The record in *Bohnert* led "to no other conclusion than that [the expert]'s opinion was founded only upon what [the complainant] said had occurred." *Id.* at 276, 539 A.2d at 662. As we explained,

> The opinion of [the expert] was not based on facts sufficient to form a basis for her opinion. There were no facts to show that [the complainant]'s allegations were true, so that a reasonably accurate conclusion that the child had been sexually abused could be made. The conclusion that she had in fact been abused was no more than mere conjecture or guess. The short of it is that the very groundwork for [the expert]'s opinion was inadequately supported.

*Id.*, 539 A.2d at 662. The same reasoning holds equal sway in the present case. Despite Appellant counsel's concerted at-

tempts before both the trial court and this Court to make the underpinnings of Dr. Abramson's proffered opinion testimony distinguishable from the circumstances attendant in *Bohnert*, those efforts were, and remain, ultimately unsuccessful.

Appellant's counsel had repeatedly assured the trial judge that Dr. Abramson's opinion would be founded solely upon his review of medical and other records, already admitted into evidence on stipulation of all the parties, as well as the uncontested evidence that Appellant was sexually abused by different persons in her household between 1981 and 1989, when she was between the ages of six and thirteen. Indeed, in framing his question to Dr. Abramson, plaintiff's counsel specifically warned the doctor not to consider Appellant's account of the sexual abuse she allegedly suffered from ages two to five: "Now, I would like to ask you to exclude from your consideration any sworn testimony. . . ." [13] Nonetheless, these maneuvers could not cure the expert opinion of its legal infirmities.

We reiterated in *Bohnert* that

no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess.

*Id.* at 274–75, 539 A.2d at 661 (quoting *State Health Dep't v. Walker*, 238 Md. 512, 520, 209 A.2d 555, 559–60 (1965) (citations omitted)). *See also Worthington Constr. v. Moore*, 266 Md. 19, 29, 291 A.2d 466, 470–71 (1972) ("An expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions." (citations omitted));

---

**13.** Although Dr. Abramson testified at trial prior to Appellant, he had access to her sworn testimony from her deposition.

Maryland Rule 5–702 (requiring a sufficient factual basis for the admission of expert testimony).

In pronouncing his opinion while disregarding Appellant's sworn testimony, and thus not incorporating her accounts of abuse prior to 1981 into his calculus, Dr. Abramson would have had to rely upon facts that were insufficient to support his purported conclusion, and therefore the opinion was inadmissible. Dr. Abramson's reasoning was essentially that, in his expert opinion, because Appellant undeniably suffered sexual abuse *after* 1981, the medical problems she endured *prior* to 1981, as documented and treated by Appellees, were caused by sexual abuse, even though all of the symptoms exhibited by Appellant could, by the expert's own testimony, be attributed to a myriad of causes wholly unrelated to sexual abuse. Appellees are correct in their assertion that the necessary link between the basis for Dr. Abramson's opinion and his conclusion is absent: the subsequent undisputed history of sexual abuse in combination with earlier medical symptoms attributable to a wide variety of causes cannot be opined to a reasonable degree of medical certainty to establish sexual abuse as the cause of those earlier symptoms. Our primary reasoning in *Bohnert*, 312 Md. at 276, 539 A.2d at 662, concluding the expert's opinion to have been inadequately supported, would be equally germane here. Because Dr. Abramson's proposed testimony, couched as expert opinion, amounted to no more than mere speculation and conjecture, it was incompetent evidence.

Conversely, because the non-testimonial materials to be considered by Dr. Abramson were insufficient to render an opinion, by necessity he would have had to ignore the limitations urged upon him by counsel in order to pronounce a factually supportable conclusion, *i.e.*, one reliant upon Appellant's accounts of early abuse. The doctor's opinion would then have been vouching for the credibility of those accounts, impermissibly so according to our alternate reasoning in *Bohnert*:

> The opinion of [Dr. Abramson] that [Appellant] in fact was sexually abused was tantamount to a declaration by [him]

that [Appellant] was telling the truth.... In the circumstances here, the opinion could only be reached if [Appellant]'s testimony were believed.... The import of the opinion was clear—[Appellant] was credible....

*Id.* at 278–79, 539 A.2d at 663. In light of the discretion and wide latitude afforded to the trial court in ruling on the admission of expert opinion testimony, *see Hartless v. State,* 327 Md. 558, 576, 611 A.2d 581, 590 (1992), we hold that the trial court did not abuse its discretion in excluding the evidence proffered by Appellant.

*JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.*