869 A.2d 837

**Lawrence POLAKOFF, et al.**

v.

**Jasmine TURNER.**

**No. 20, Sept. Term, 2004.**

Court of Appeals of Maryland.

March 11, 2005.

468

470

---

Charles I. Joseph (M. Bradley Hallwig, Anderson, Coe & King, LLP, Baltimore, on brief), for petitioners.

Saul E. Kerpelman (Lisa J. Smith, Saul E. Kerpelman & Associates, P.A., Baltimore, on brief), for respondent.

Joshua A. Auerbach, Debra L. Gardner, Francine K. Hahn, Baltimore, amici curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

On October 30, 2002, a jury in Baltimore City found Lawrence Polakoff ("Polakoff") and Chase Management ("Chase") negligent in the lead-paint poisoning of Jasmine Turner ("Jasmine"), a minor who resided in a home owned by Polakoff and managed by Chase. The jury awarded Jasmine $500,000 that

was later reduced by the Circuit Court for Baltimore City to $350,000, pursuant to the cap on non-economic damages. Both parties appealed to the Court of Special Appeals.[1]

While the matter was pending in the Court of Special Appeals, we decided *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003), in which we held that "in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks*, 378 Md. at 79, 835 A.2d at 621. *Brooks* overruled *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994), which held that "a landlord is not liable for a defective condition on the property unless the landlord knows or has reason to know of the condition and had a reasonable opportunity to correct it." *Richwind*, 335 Md. at 673, 645 A.2d at 1153 (internal citations omitted).

Polakoff and Chase argued to the Court of Special Appeals, as they do here, that *Brooks* should apply prospectively only. They claim that they relied on the notice standard enunciated in *Richwind* regarding lead paint and that it would be unfair to hold them to the "new" notice standard of *Brooks*. The intermediate appellate court applied the general rule that a new holding applies to all pending cases and concluded that the *Brooks* decision and the notice requirement enunciated therein applied to the present case. *Polakoff v. Turner*, 155 Md.App. 60, 69–70, 841 A.2d 406, 412 (2004).

---

1. Five different groups, including the Mayor and City Council of Baltimore City, the Housing Authority for Baltimore City, the Greater Baltimore Property Owners Association, the Maryland Multi–Housing Association, and the National Association of Industrial and Office Properties, filed *amici curiae* briefs in the Court of Special Appeals in support of Polakoff and Chase. The Public Justice Center, the Coalition to End Childhood Lead Poisoning, and Advocates for Children and Youth filed an *amicus curiae* brief in support of Jasmine. Only the latter group filed an *amicus* brief in this Court.

By petition for *writ of certiorari* to this Court, Polakoff and Chase challenge the ruling of the Court of Special Appeals asserting that *Brooks* should apply prospectively, that the intermediate appellate court erred in applying *Brooks* to the case at bar, that *Brooks* was wrongly decided, and that the trial court erred in denying their motion for judgment notwithstanding the verdict because there was insufficient evidence to prove that they had reason to know of the flaking, loose, or peeling paint. We granted *certiorari* on May 14, 2004. *Polakoff v. Turner,* 381 Md. 324, 849 A.2d 473 (2004).

We reaffirm our holding in *Brooks* and hold that the standard for establishing a *prima facie* case based on a violation of the Baltimore City Housing Code ("Code") as enunciated therein applies to all cases not final at the time *Brooks* was filed.

I.

In March of 1985, Lelia Whittington ("Lelia") and her daughter, Crystal Whittington ("Crystal"), moved into a residential rental property located at 17 North Bentalou Street. 17 North Bentalou is a row house located in Baltimore City. It was built prior to 1950 and was later determined to contain lead-based paint. While residing at the property, Crystal gave birth to Jasmine on April 3, 1990. The women lived in the home for nine years until August of 1994 when Polakoff asked them to move out.

Polakoff was the owner of 17 North Bentalou from 1975 until June 30, 1992, when he transferred the property to C.F.A.S. Limited Partnership("CFAS").[2] While under his ownership, Polakoff hired a property manager to handle day-to-day management and maintenance. After the sale to CFAS on June 30, 1992, Chase Management ("Chase") took over the day-to-day operation of managing the property.[3]

2. Polakoff is a limited partner in CFAS and he serves as its president.

3. Polakoff is the president of Chase Management, Inc.

Lelia and Crystal testified that prior to moving into the Bentalou property they conducted a walk-through to inspect it. Both women testified that the windowsills, and baseboards had been freshly painted before they moved. The paint on the windowsills, however, was "bumpy" from having been applied on top of old chipping paint. Crystal testified that the majority of the walls had wallpaper on them but those that were painted had been freshly painted and were "smooth." The women testified that during their tenancy they noticed that the paint around the windows had begun to chip and flake. Crystal testified that she noticed chipping and flaking paint about 1½ years into the tenancy, while Lelia testified that she noticed the chipping "about two to three years" into the tenancy. Crystal also testified that around the same period of time, 1½ years into the tenancy, the wallpaper began to peel away from some of the walls, revealing painted walls with disintegrating plaster behind the wallpaper.

Prior to Jasmine's birth, a workman painted the two windowsills in the living room. The paint was applied again over top of the chipping and flaking paint without removing the old paint. According to testimony, the paint continued to chip. Other than the one time the windowsills were painted, no other painting or repairs to the chipping and flaking paint were made during the nine-year tenancy. There was testimony, however, that other repairs were made to the house, including work on the windows themselves.

In early 1993, when Jasmine was almost three years old, a routine physical revealed that she had elevated levels of lead in her blood.[4] Doctors placed Jasmine on a special diet and gave her iron to treat the poisoning. Crystal was also in-

4. Jasmine's blood lead level was 22 ug/dl. A child is considered to have "elevated" blood lead levels at 10 ug/dl. Ug/dl is an abbreviation for micrograms per deciliter. It indicates that the child has 22 micrograms of lead per every deciliter of blood. *See Jones v. Mid-Atlantic Funding,* 362 Md. 661, 668 n. 12, 766 A.2d 617, 621 n. 12 (citing *Preventing Lead Poisoning in Young Children,* A Statement by the Center for Disease Control (1991)).

structed to remove anything from the home that could contribute to Jasmine's lead levels, e.g., lead containing dust.

Polakoff testified that at the time of the trial he had been in the real estate business for approximately thirty (30) years. He testified that at the time he leased the premises to the Whittingtons, he was aware of the following: that most housing in Baltimore City built before 1950 would probably contain some sort of lead-based paint; that deteriorating lead paint can be a potential danger to young children; that it was a violation of the Baltimore City Housing Code for a property to have peeling, chipping, or flaking paint; and that the Code requires flaking and chipping paint to be made smooth before repainting the surface. He also testified that he did not inspect 17 North Bentalou to see if it was "fit for habitation" before the Whittingtons moved in because "I have a painter working for me who had probably 30 years experience painting Baltimore City houses, mostly row houses. He knew the process. He was experienced. He had a level of expertise and he knew how to prepare a home for painting and that's what he did on all the houses he painted for me including 17 North Bentalou Street." Polakoff further testified that he did not inform Ms. Whittington of the dangers of lead paint prior to her moving in; however, he did inform her of the procedure for reporting needed repair work.

## II.

### A. *Brooks v. Lewin Realty III, Inc.*

At the core of Polakoff and Chases's argument is the question of notice and whether we correctly decided *Brooks.* If we reaffirm *Brooks,* which we do, then the only remaining question is whether it applies to the case at bar. We therefore begin with a review of the *Brooks* opinion.

In *Brooks* we stated that,

> under the common law and in the absence of a statute, a landlord ordinarily has no duty to keep rental premises in repair, or to inspect the rental premises either at the

> inception of the lease or during the lease term. There are, however, exceptions to this general rule.
>
> Moreover, where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff, another well-settled Maryland common law rule has long been applied by this Court in negligence actions. That rule states that the defendant's duty ordinarily "is prescribed by the statute" or ordinance and that the violation of the statute or ordinance is itself evidence of negligence.

*Brooks,* 378 Md. at 78, 835 A.2d at 620. We then cited an extensive list of cases that apply the "statute or ordinance" rule. *See Brooks,* 378 Md. at 78–9, 835 A.2d at 621 for cases cited therein. We explained:

> Under this principle, in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of. Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence.[5]
>
> Where there is evidence that the violation of the statute proximately caused the plaintiff's injury, evidence of such violation is sufficient evidence to warrant the court in submitting the case to the jury on the question of the [defen-

---

5. The standard for establishing a *prima facie* case of negligence in a statutory-based negligence action is different from the general standard for establishing a *prima facie* case of negligence in cases that are not governed by a statute. *See Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180, 188 (1994) (listing the elements for a negligence suit as "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty").

dant's] negligence. The trier of fact must then evaluate whether the actions taken by the defendant were reasonable under all the circumstances.

* * * * * *

Nevertheless, once it is established that there was a statutory violation, the tort defendant's knowledge that he or she violated the statute is not part of the tort plaintiff's burden of proof. It is the violation of the statute or ordinance alone which is evidence of negligence.

*Brooks,* 378 Md. at 79–80, 835 A.2d at 621–22 (internal citations omitted).

Having determined the applicable rule, we turned to the Code itself. We began by noting that the Code "contains a comprehensive statutory scheme aimed at 'establish[ing] minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings ... in order to make dwellings safe, sanitary, and fit for human habitation.'" *Brooks,* 378 Md. at 81, 835 A.2d at 622 (quoting Baltimore City Code (2000 Repl.Vol.), Art. 13, § 103(a)(2)). It imposes "numerous duties and obligations upon landlords who rent residential property." *Brooks,* 378 Md. at 81, 835 A.2d at 622. Section 702 of the Code imposes a duty on property owners to keep a dwelling in "good repair and safe condition." Section 702(a) provides that "[e]very building and all parts thereof used or occupied as a dwelling shall, while in use or at any time when the lack of maintenance affects neighboring property, be kept in good repair, in safe condition, and fit for human habitation." Section 703(b)(3) provides that "good repair and safe condition" includes a requirement that "[a]ll walls, ceilings, woodwork, doors, and windows shall be kept clean and free of any flaking, loose, or peeling paint and paper." The Code places the duty on the owner or operator of the property to keep it in compliance with all provisions of the Code. § 310(a)(1). It further provides the owner with access to the property during a tenancy "for the purpose of making such inspection and such repairs or alterations as are necessary to effect compliance with the provisions of this Code...." § 909.

Based on the language of the Code, we concluded that the landlord's duty to keep the property in compliance is continuous. "The landlord must take whatever measures are necessary during the pendency of the lease to ensure the dwelling's continued compliance with the Code." *Brooks,* 378 Md. at 84, 835 A.2d at 624. Consequently, because the Code prescribes the property owner's duty to keep the property continuously free of any flaking, loose, or peeling paint, the failure to keep the property in such a condition is itself evidence of negligence.

*Brooks* does not hold that a landlord will be held strictly liable for violations of the Code; rather it reaffirmed the long-standing common law rule that a violation of a statute or ordinance is *evidence* of negligence. As we repeatedly stated in *Brooks,* proof of a statutory violation, plaintiff's membership in the class of people designed to be protected by the statute, and causation, amount to *prima facie* evidence of negligence, not negligence *per se. See Brooks,* 378 Md. at 78–81, 84–5, 85 n. 5, 89, 835 A.2d at 620–25, 625 n. 5, 627; *see also, Absolon v. Dollahite,* 376 Md. 547, 831 A.2d 6 (2003) (stating that it is a "long established general rule in Maryland that the violation of a statutory duty is only evidence of negligence, but does not establish negligence *per se* " (internal citations omitted));[6] *Bentley v. Carroll,* 355 Md. 312, 325, 734 A.2d 697,

6. *Absolon* involved a personal injury suit brought by a pedestrian who was injured when she was struck by a car in the crosswalk but while the crosswalk signal indicated a flashing "red hand." The defendant argued that the pedestrian's alleged violation of a statute which required the pedestrian to remain on a safety island when the "red hand" crosswalk signal was displayed established contributory negligence as a matter of law and that he was entitled to summary judgment. *Absolon,* 376 Md. at 550, 831 A.2d at 8. The trial court granted the motion. *Absolon,* 376 Md. at 551, 831 A.2d at 8. We reversed, holding that the trial court erred in finding that the statute established an absolute duty and amounted to negligence as a matter of law. *Absolon,* 376 Md. at 553, 831 A.2d at 9–10. We reasoned:

> Section 21–203(e) [of the Transportation Article] arguably establishes a duty for pedestrians to remain on or proceed to the nearest safety island. Sue Ann Absolon was standing in the median strip, which may or may not fall within the statutory definition of a "safety

704–05 (1999) ("Not long ago we reaffirmed that [t]his Court has consistently held that the violation of a statutory duty may furnish evidence of negligence. The positive evidentiary value of the statutory violation, however, is subject to the condition that 'the person alleging the negligence is within the class of persons sought to be protected, and the harm suffered is of a kind which the statute was intended, in general, to prevent.' ") (quoting *Bd. of County Commissioners v. Bell Atlantic–Maryland, Inc.*, 346 Md. 160, 179, 695 A.2d 171, 181 (1997)).[7] Contrary to the view expressed in Polakoff and Chase's brief, evidence of negligence does not *ipso facto* equate to liability. Before a landlord can be found liable, the trier of fact must

---

island." When she stepped off the median, she may have been in violation of her statutory duty of care. If so, the evidence of the violation should be submitted to the jury, along with any other evidence tending to show contributory negligence or the lack thereof. A violation of the statute alone is not sufficient to establish an absolute duty so as to satisfy the requirement of Maryland Rule 2–501(e) for a grant of summary judgment, "that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

*Absolon*, 376 Md. at 557, 831 A.2d at 11–12 (internal citations omitted).

7. *Bentley* involved a medical malpractice suit alleging negligence on the part of family healthcare practitioners who treated a sexually abused child, named Bentley, but failed to report the abuse. Bentley contended that a statute then in effect, § 35A of the Child Abuse Act, Md.Code (1957, 1976 Repl.Vol., 1978 Cum.Sup.) Article 27, § 35A (relevant language recodified in Md.Code (1984) § 5–903 of the Family Law Article by Ch. 296 § 2 and currently found in Md.Code (2002) § 5–704 of the Family Law Article), imposed a statutory duty upon doctors to report the possibility of child abuse in certain circumstances, that the defendant doctors violated that duty in their treatment of her, and that their violation of the statute amounted to evidence of malpractice. *Bentley*, 355 Md. at 318, 734 A.2d at 701. We held that,

> the trial court was obligated in the instant case to instruct the jury in some manner as to the legal propositions that (1) Maryland statutory law, during the relevant period, required every physician who treated a child and believed or had reason to believe that the child had been abused was required to make a report as to the existence of such suspected abuse to the local department of social services or to the appropriate law enforcement agency, which would then investigate and intervene to the extent necessary to redress prior abuse and prevent future occurrences and (2) the violation of such a statute by a physician constitutes evidence of negligence.

*Bentley*, 355 Md. at 328, 734 A.2d at 706.

determine whether the defendant acted reasonably given the circumstances. As we stated in *Brooks,* "our holding in the instant case does not impose a strict liability regime upon landlords. Whether [the landlord] is held liable for any injury to a child, based on leadpaint poisoning, will depend on the jury's evaluation of the reasonableness of the [landlord's] actions under all the circumstances." *Brooks,* 378 Md. at 84–5, 835 A.2d at 624. Thus, liability will depend on the fact-finder's determination regarding whether the landlord acted reasonably under all the circumstances. *Brooks,* 378 Md. at 85 n. 5, 835 A.2d at 624 n. 5.

The issue of what qualifies as "reasonable" will, as it does in all negligence cases, depend on the facts and circumstances of the case. As we noted in *Brooks,* the fact-finder's determination of reasonableness "is the essence of a negligence action." *Brooks,* 378 Md. at 85 n. 5, 835 A.2d at 625 n. 5 ("negligence is a failure to do what the reasonable [person] would do 'under the same or similar circumstances' " (internal citation omitted)). "[I]t will be the duty of the trier of fact to determine whether the steps taken by the landlord to ensure continued compliance with the Code, i.e. the frequency and thoroughness of inspections, and the maintenance of the interior surfaces of the dwelling, were reasonable under all the circumstances. The test is what a reasonable and prudent landlord would have done under the same circumstances." *Brooks,* 378 Md. at 86, 835 A.2d at 625. *See also, Juarez v. Wavecrest Management Team Ltd.,* 88 N.Y.2d 628, 649 N.Y.S.2d 115, 672 N.E.2d 135, 141 (1996) (interpreting a New York City Code similar to the Baltimore City Code and concluding that "[w]here, however, a landlord establishes that it exercised due care, it will not be held liable. To avoid liability, a landlord must prove that, even though it violated [the local lead-paint statute], it was acting reasonably under the circumstances.").

Liability will depend on the reasonableness of the landlord's efforts to remain in compliance with the statute; therefore, it is incumbent upon the landlord to take such

reasonable steps as may be necessary. One surefire way of avoiding lead-paint poisoning liability is to remove lead paint from the rental property. We recognize, however, that the current law does not require this action. Less extreme options may include: notifying the tenant in writing and orally of the possible presence of lead paint in the property and its potential danger; asking the tenant to notify the landlord or property manager immediately if flaking, loose, or peeling paint occurs; and inspecting the property at the inception and at regular intervals throughout the tenancy to ensure that there is no flaking, loose, or peeling paint. This list is by no means exhaustive nor is it a guarantee that a jury will find the landlord's actions reasonable. Our point is simply to show that there are reasonable ways of attempting to satisfy one's duty pursuant to the Code. *See also,* Md.Code (1996 Repl. Vol.), § 6–801 *et seq.* of the Environment Article (entitled "Reduction of Lead Risk in Housing").[8]

We expressly recognized in *Brooks* that our holding was in conflict with parts of our opinion in *Richwind,* 335 Md. 661, 645 A.2d 1147. *Brooks,* 378 Md. at 86, 835 A.2d at 625. *Richwind* held that "a landlord is not liable for a defective condition on the property unless the landlord knows or has reason to know of the condition and had a reasonable opportunity to correct it." *Richwind,* 335 Md. at 673, 645 A.2d at 1153. Richwind argued to the Court that, despite the numerous statutory enactments that impact upon the relationship between the landlord and tenant, the statute does not "supercede the common law requirement that a landlord's liability for negligence depends upon notice of a particular defect and a reasonable opportunity to correct it." *Richwind,* 335 Md. at 670, 645 A.2d at 1151. We recognized that certain statutory

8. In 1994, the General Assembly enacted the "Reduction of Lead Risk in Housing," Md.Code (1996 Repl.Vol.), § 6–801 *et seq.* of the Environment Article, which impacts a landlord's liability in lead paint cases. The stated purpose of subtitle 8 is to "reduce the incidence of childhood lead poisoning, while maintaining the stock of affordable rental housing." § 6–802. It contains means of limiting landlord lead paint liability, provided the landlord complies with certain preventive measures. *See* §§ 6–815 through 6–819.

enactments may alter the common law. We concluded, however, that based on §§ 301 through 303, the Code and the common law notice requirement were consistent with each other and therefore the Code did not do away with the notice requirement. *Richwind,* 335 Md. at 672–674, 645 A.2d at 1152–53.

In *Brooks,* we specifically disapproved of this reasoning. *Brooks,* 378 Md. at 87, 835 A.2d at 626. We noted that "[t]he flaw in the *Richwind* opinion's analysis is its extension of §§ 301 and 303's notice requirement to occupants." [9] *Id.* We concluded that "[t]he Housing Code provisions relied on in the *Richwind* opinion do not alter the requirements set forth by this Court for a plaintiff to make out a *prima facie* case based on [statutory] negligence. The Housing Code does not make the landlord's notice of a defective condition a factor with regard to the landlord's duty to the tenant." *Brooks,* 378 Md. at 88–89, 835 A.2d at 627.[10]

---

9. Sections 301 through 303 govern the procedure for pursuing violations of the Code by the Department of Housing and Community Development. They do not purport to address any notice requirements for tenants. Section 301 provides in relevant part that,

> [w]henever the Commissioner of Housing and Community Development determines that there has been a violation of any provision of this Code or of any rule or regulation adopted pursuant hereto, he shall give notice of such alleged violation to the person or persons responsible therefor as hereinafter provided.

Section 301(b) then details the form and content of the required notice.

10. Much of Polakoff and Chase's brief is dedicated to statutory construction arguments as to why our interpretation of the Housing Code in *Brooks* is incorrect. At the core of their argument are two rules of statutory construction which state that legislative bodies are aware of "the interpretations that this Court has placed upon its enactments," (*Blevins v. Baltimore County,* 352 Md. 620, 642, 724 A.2d 22, 33 (1999)), and that when a legislative body reenacts a statute without altering its language following an opinion of this Court interpreting the statute, we presume the legislative body acquiesced in our interpretation. *Stack v. Marney,* 252 Md. 43, 49, 248 A.2d 880, 884 (1969). Although it is true that we may interpret silence as acquiescence, we find action more compelling. Following our opinion in *Brooks,* City Council Bill 04–1276, entitled "Building, Fire and Related Codes–Landlord's Tort Liability" was introduced as an addition to the Code. It stated "[t]his code is not intended to alter the common law principle of tort liability that a landlord may be found liable for personal injury to a

We remain committed to the analysis in *Brooks*. The law in this State regarding the breach of a statutory duty remains the same today as it has for over ninety years. To make out a *prima facie* case in a negligence action based on the breach of a statutory duty, a plaintiff must show "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks*, 378 Md. at 79, 835 A.2d at 621. "Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent." *Id.*

We conclude, as we did in *Brooks*, that the Code places a continuous duty on landlords to maintain their properties in "good repair and safe condition," including keeping the premises free of flaking, loose, or peeling paint. If a landlord of property located in Baltimore City fails to maintain the premises in a safe condition and someone whom the Code was designed to protect, i.e., a resident child, is injured as a result of the landlord's failure to maintain the premises, the plaintiff will have successfully established a *prima facie* case of negligence. It will then be incumbent upon the finder of fact to determine whether the landlord's actions were reasonable under all of the circumstances. Pursuant to the established principles of Maryland tort law cited in *Brooks*, if Jasmine could establish a violation of the Code which proximately caused her injuries, she would be entitled to have the negligence count of her complaint submitted to the trier of fact for a determination of whether Polakoff and Chase acted reasonably under all of the circumstances.

---

tenant caused by a defective condition on the leased premises only if the landlord had knowledge or reason to know of the condition and a reasonable opportunity to correct it." The bill was a direct result of our holding in *Brooks*. Its trip through the legislative process, however, was short lived as it did not make it out of the Judiciary Committee.

As previously discussed, the Code requires that occupied dwellings continuously be kept in good repair and safe condition, which includes keeping windows free of flaking, loose, or peeling paint. §§ 702(a) and 703(b)(3). Jasmine produced testimony that flaking, loose, or peeling paint existed as early as 1½ years into the tenancy and that the paint on the windowsills was "bumpy" from the inception of the tenancy as a result of new paint being applied on top of old chipping paint. There was testimony that prior to Jasmine's birth, a workman repainted the windowsills in the living room but, again, the new paint was applied on top of the old chipping paint. There was also testimony that Jasmine spent much of her time at the "bumpy" windowsills looking out the window. Based on this testimony, Jasmine met her burden of production regarding the presence of flaking, loose, or peeling paint in violation of the Code. She established proximate cause by presenting evidence that she is a member of the class of people sought to be protected by the Code, and that her injury, lead-paint poisoning, is the type of injury the drafters of the Code sought to prevent. These two things taken together, a violation of the Code and proximate cause, establish a *prima facie* case of negligence. Consequently, Jasmine was entitled to have her case presented to the trier of fact for a determination of whether Polakoff and Chase acted reasonably given the circumstances.

With regard to the issue of reasonableness, the jury heard testimony that Polakoff was aware of the following at the inception of the lease: that most housing in Baltimore City built before 1950 would probably contain some sort of lead-based paint; that deteriorating lead paint can be a potential danger to young children; that it was a violation of the Code for a property to have peeling, chipping, or flaking paint; and that the Code requires that flaking and chipping paint to be made smooth before repainting the surface. Polakoff testified that he did not inspect the premises at the inception of the lease but instead relied on the experience of a painter with whom he had worked for many years. He further testified that at no time during the nine-year tenancy did he or anyone

working for him inspect the interior of the house to ensure its compliance with the Code. Polakoff instead relied on tenants to notify him of needed maintenance. He further testified that he did not inform Ms. Whittington of the dangers of lead paint prior to her moving into the property. Based on this information, a jury could reasonably conclude that, despite being aware of the danger and likely presence of lead paint in the house, as well as the Code's requirement that the house be kept free of flaking, chipping, or peeling paint, Polakoff did not inspect the inside of the residence at any point during the nine-year tenancy. The jury could reasonably conclude that Polakoff did not act as a reasonable landlord would have acted, given the circumstances.

### III. Application of *Brooks*

The final issue before the Court is whether the holding of *Brooks* applies to the present case. Polakoff and Chase argue that *Brooks* should apply to *Brooks* and to cases arising from facts that postdate our decision but not to all others which arise on facts predating the opinion.[11] Although they do not use the term, what they seek is "selective prospectivity."

The U.S. Supreme Court identifies three types of application categories, retroactive, purely prospective, and modified or selective prospectivity. *James B. Beam Distilling Company v. Georgia,* 501 U.S. 529, 535–37, 111 S.Ct. 2439, 2443–44, 115 L.Ed.2d 481, 488–89 (1991) (plurality opinion). Retroactive application applies to "the parties before the court and to all others by and against whom claims may be pressed, consistent with *res judicata* and procedural barriers such as

11. Polakoff and Chase cite the Court of Special Appeals case, *Stover v. Stover,* 60 Md.App. 470, 483 A.2d 783 (1984) in support of their proposition that "even when a change in law is given prospective application, that change will still apply to the case where the new rule was first decided." The Court of Special Appeals in *Stover* explained this application by noting that "[i]f the litigant who successfully contests a standing rule of law is denied relief because the new rule applies purely prospectively, there would be little motivation to attack settled rules of law." *Stover,* 60 Md.App. at 476, 483 A.2d at 786.

statute of limitations." *Beam*, 501 U.S. at 535, 111 S.Ct. at 2443, 115 L.Ed.2d at 488. The Supreme Court noted that retroactivity is "overwhelmingly the norm, and is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law." *Id.* (Internal citations omitted.) Pure prospectivity is the "method of overruling, under which a new rule is applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision. The case is decided under the old law but becomes a vehicle for announcing the new, effective with respect to all conduct occurring after the date of that decision." *Beam*, 501 U.S. at 536, 111 S.Ct. at 2443, 115 L.Ed.2d at 488 (internal citations omitted).

Modified or selective prospectivity is the method by which "a court may apply a new rule in the case in which it is pronounced, then return to the old one with respect to all others arising on facts predating the pronouncement." *Beam*, 501 U.S. at 537, 111 S.Ct. at 2444, 115 L.Ed.2d at 489. It is distinguishable from pure prospectivity in that the new pronouncement applies to the case in which it is made and not solely to cases arising after the pronouncement. This is the form of application sought by Polakoff and Chase in the current matter.

With regard to selective prospectivity, the Supreme Court has noted that "this method ... enjoyed its temporary ascendancy in the criminal law during a period in which the Court formulated new rules, prophylactic or otherwise, to insure protection of the rights of the accused." *Id.* (Internal citations omitted.) The Supreme Court, however, has abandoned the use of selective prospectivity. *See Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (overruling *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) on the grounds that "the integrity of judicial review requires that [the Court] apply [the new] rule to all similar cases pending on direct review" and "selective application of new rules violates the principle of treating similarly situated

[parties] the same"); *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 94–95, 113 S.Ct. 2510, 2516–517, 125 L.Ed.2d 74, 85 (1993); *Beam,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481.[12]

Our own cases have "essentially followed the teaching of *Linkletter v. Walker* in deciding whether a new interpretation of a Maryland constitutional provision, statute, or rule, should receive retrospective effect." *American Trucking Associations, Inc. v. Goldstein,* 312 Md. 583, 591, 541 A.2d 955, 959 (1988) citing *State v. Hicks,* 285 Md. 310, 336–38, 403 A.2d 356, 370–71 (1979); *see also, Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 471, 601 A.2d 633, 658 (1992) ("When a prior case in this Court is overruled on the ground that it was erroneously decided, the question whether our holding is retrospective or only prospective is governed by the principles set forth in such opinions such as *American Trucking* ... *Linkletter v. Walker* ....").[13] The general rule in these cases is that even when a "prospective" application applies because of the *Linkletter* factors, "a new interpretation of a constitutional provision,

---

**12.** In *Harper,* the Supreme Court adopted the opinion of the majority of Justices in *Beam* and stated that the rule in civil cases is:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. This rule extends *Griffith's* ban against "selective application of new rules." Mindful of the "basic norms of constitutional adjudication" that animated our view of retroactivity in the criminal context, we now prohibit the erection of selective temporal barriers to the application of federal law in noncriminal cases. In both civil and criminal cases, we can scarcely permit "the substantive law [to] shift and spring" according to "the particular equities of [individual parties"] claims of actual reliance on an old rule and of harm from retroactive application of a new rule.

*Harper,* 509 U.S. at 97, 113 S.Ct. at 2517, 125 L.Ed.2d at 86 (internal citations omitted).

**13.** Pursuant to *Linkletter,* "prospective application rested on the purpose of the new rule, the reliance placed upon the previous view of the law, and the 'effect on the administration of justice of a retrospective application' of the new rule." *Harper,* 509 U.S. at 94, 113 S.Ct. at 2517, 125 L.Ed.2d at 84 (citing *Linkletter,* 381 U.S. at 636, 85 S.Ct. at 1741, 14 L.Ed.2d at 608).

statute, or rule has included the case before us and all other pending cases where the relevant question has been preserved for appellate review." *American Trucking,* 312 Md. at 592, 541 A.2d at 959 (citing *Potts v. State,* 300 Md. 567, 576–83, 479 A.2d 1335, 1340–43 (1984); *McClain v. State,* 288 Md. 456, 470, 419 A.2d 369, 374 (1980); *State v. Hicks,* 285 Md. 310, 338, 403 A.2d 356, 371 (1979)).[14]

It appears that what we have referred to as "prospective" application in *American Trucking,* to wit, application of a new interpretation of a statute to the case before us and all other cases pending where the issue has been preserved for appellate review, the Supreme Court classifies as "retroactive" application.[15] For purposes of clarity, we hereby adopt the Supreme Court's classification of "retroactive" for application of new interpretations of constitutional provisions, statutes or rules that include the case before us and all other pending cases where the relevant question has been preserved for appellate review. Regardless of how the application is classified, however, both the federal rule and the general rule in Maryland is that a new interpretation of a statute applies to the case before the court and to all cases pending where the issue has been preserved for appellate review. *See McClain v. State,* 288 Md. 456, 463–64, 419 A.2d 369, 372 (1980) (applying the exclusionary rule of *Johnson v. State* retroac-

---

14. In the case where this Court announces a change in the common law, however, we continue to apply selective prospectivity as defined by the Supreme Court. *See American Trucking,* 312 Md. at 592 n. 7, 541 A.2d at 959 n. 7, (distinguishing cases involving new interpretations of statutes from cases that change the common law and noting that changes in common law "[o]rdinarily, except as to the parties before the court, such decisions are fully prospective"); *Boblitz v. Boblitz,* 296 Md. 242, 275, 462 A.2d 506, 522 (1983).

15. The Court of Special Appeals aptly noted in its opinion in the present case that our cases have not always been consistent regarding what is meant by the terms retroactive and prospective, as "they are not always used in the same sense." *Polakoff,* 155 Md.App. at 66, 841 A.2d at 410. The court noted that "the term prospective is sometimes used in the same manner as retroactive, i.e., to indicate that the new holding applies to the case which produced the new holding and to all pending cases in which the issue has been preserved for appellate review." *Id.*

tively). Both rules are consistent with the view that the law can "scarcely permit 'the substantive law to shift and spring' according to the particular equities of individual parties' claims of actual reliance on an old rule and of harm from retroactive application of a new rule." *Harper,* 509 U.S. at 97, 113 S.Ct. at 2517, 125 L.Ed.2d at 86 (internal citations omitted).

As discussed, *supra,* in *Brooks* we held that our prior interpretation of the Code in *Richwind* was erroneous.[16] In doing so we applied the well-settled Maryland common law rule that when there is an applicable statute designed to protect a certain class of people, the defendant's duty ordinarily is prescribed by the statute. *Brooks* represented a different interpretation of a statute and the question of its application is governed by the standard discussed in *American Trucking.* Consequently, our decision in *Brooks* applies retroactively, and includes the case at bar.

Moreover, our *per curiam* decision in *Gentry v. Ebersole,* 378 Md. 612, 837 A.2d 924 (2003), makes it clear that *Brooks* applies retroactively. *Gentry* involved a lead paint case in which the defendant property owner was granted summary judgment on the issue of notice. The Court of Special Appeals affirmed the Circuit Court and the plaintiff petitioned this Court for *certiorari* while *Brooks* was pending. Following the publication of our *Brooks* opinion, we issued the *per curiam* opinion which mandated that the case be remanded for further proceedings consistent with *Brooks.*

We further note that in the present case, the jury was instructed that it had to find that Polakoff and Chase had reason to know of the existence of flaking, loose, or peeling

16. Contrary to the position taken by the dissent, *Brooks* did not involve a change in the common law. Judge Eldridge, writing for the Court, explained that the Court in *Richwind* misread the Housing Code in reaching its decision. *Brooks,* however, involved this Court's subsequent correction of that misinterpretation. Although, in the case at bar, we address the parties contentions with regard to the retrospective application of the *Brooks* decision, our application of the common law rule that violation of a statute is evidence of negligence does not necessarily give rise to a retroactive versus a prospective analysis. The real question is which law is applicable on direct appellate review.

paint in order to find defendants liable. Presumably, because the jury found in favor of Jasmine, they concluded that Polakoff and Chase did have knowledge. Even assuming *Brooks* did not apply to the present case, there is no prejudice to Polakoff and Chase in that the Circuit Court required Jasmine to prove more than was necessary to establish liability, to wit, notice of the defect. In Maryland we give great deference to a jury's determination of a disputed fact, consequently the trial court properly denied Polakoff and Chase's motion for judgment notwithstanding the verdict. *See Houston v. Safeway Stores Inc.*, 346 Md. 503, 521, 697 A.2d 851, 859 (" 'As with respect to a judgment n.o.v .... [i]f there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then the trial court would be invading the province of the jury by declaring a directed verdict.' " (Internal citation omitted.)). Here, there was testimony that repairs were made to the inside of the house during the tenancy, including work on the windows alleged to have been the source of the paint which poisoned Jasmine. From this testimony, a rational jury could conclude that Polakoff, through his agent, should have been on notice of the chipping paint on the windowsills.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

Dissenting Opinion by RAKER, J., which WILNER, J., joins.

RAKER, J., dissenting, in which WILNER, J., joins.

The question in this case is whether the holding in *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003), applies to this case. I would hold that it does not and that *Brooks* applies prospectively only. *See, e.g., Boblitz v. Boblitz,* 296 Md. 242, 275, 462 A.2d 506, 522 (1983) (abrogating the interspousal immunity rule in Maryland as to cases sounding in negligence, applying the abrogation to the instant case and prospectively to all such causes of action accruing after the date of the filing of the opinion in that case). Accordingly, I would reverse the judgement of the Court of Special Appeals.

Writing for the Court on the issue of the prospective effect of a decision of this Court, in *Julian v. Christopher,* 320 Md. 1, 575 A.2d 735 (1990), Judge Chasanow wrote:

> "In appropriate cases, courts may 'in the interest of justice' give their decisions only prospective effect. Contracts are drafted based on what the law is; to upset such transactions even for the purpose of improving the law could be grossly unfair. Overruling prospectively is particularly appropriate when we are dealing with decisions involving contract law. The courts must protect an individual's right to rely on existing law when contracting.
>
> "Ordinarily decisions which change the common law apply prospectively, as well as to the litigants before the court. *Williams v. State,* 292 Md. 201, 217, 438 A.2d 1301, 1309 (1981). What is meant by 'prospectively' may depend on the fairness of applying the decision to cases or events occurring after the effective date of the decision. *See, e.g., Boblitz v. Boblitz,* 296 Md. 242, 275, 462 A.2d 506, 522 (1983) (abrogating interspousal immunity in negligence cases—decision applicable to the case before the court and causes of action accruing or discovered after the date of the decision); *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 162, 497 A.2d 1143, 1162 (1985) (imposing strict liability on manufacturer of 'Saturday Night Specials'—decision applicable to the case before the court as well as retail sales after the date of the mandate). It is reasonable to assume that landlords may have relied on the *Klawans* interpretation when entering into leases with 'silent consent' clauses. This reliance should be protected. Contracts should be interpreted based on the law as it existed when they were entered into. Therefore, whether the *Klawans* case or the instant case governs the interpretation of a "silent consent" clause depends on whether the lease being interpreted was executed before or after the mandate in this case."

*Id.* at 10–11, 575 A.2d at 739–40.

Landlords in the City of Baltimore had a right to rely on the common law in this State and the law as set out in

*Richwind.* The landlords in the City had no reason to anticipate that they had an affirmative duty to inspect properties for peeling or flaking paint after the inception of the tenancy. Out of fairness to the landlords in the City, *Brooks* should be applied prospectively only. To declare that plaintiffs need not show notice and to apply the rule retroactively is unjust and unfair.

I adhere to my view expressed in my dissent in *Brooks* that the case was wrongfully decided. I reiterate:

> ". . . that absent notice, actual or constructive, the landlord has no duty, even under the Housing Code, to inspect the demised premises during the tenancy. The tenant is in a superior position to detect chipping or peeling paint and should therefore notify the landlord of the hazard. Nor does the landlord have a duty to continuously inspect premises under the tenant's control to see if there is chipping or peeling paint; that duty to inspect arises at the inception of the tenancy. This is so under the common law, and under the City Code."

378 Md. at 97, 835 A.2d at 632.

I respectfully dissent. Judge Wilner has authorized me to state that he joins in this dissenting opinion.