959 A.2d 110

Lester **RIVERS**

v.

**HAGNER MANAGEMENT CORPORATION, et al.**

Nos. 516, 1870, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Oct. 29, 2008.

634

Kevin J. Finnegan (Goldberg, Finnegan & Mester, LLC, on brief), Silver Spring, for Appellant.

Mark T. Mixter, Baltimore, for Appellee.

Panel: HOLLANDER, ZARNOCH, THIEME, RAYMOND G., JR. (Retired, specially assigned), JJ.

HOLLANDER, J.

In this negligence/premises liability action brought by Lester Rivers, appellant, against Hagner Management Corporation ("Hagner") and Oxon Park Apartments, Inc. ("Oxon Park"), appellees, Rivers sued to recover for injuries he sustained while attempting to flee from a fire in the entryway of the apartment building in which he resided. Appellees owned and operated the building. Because the fire was started by a serial arsonist, the Circuit Court for Prince George's County concluded that appellees were not negligent and granted summary judgment to them.

Appellant has noted two appeals in connection with the litigation (No. 516 and No. 1870, September Term, 2007), which have been consolidated for briefing and argument. As to appeal No. 516, appellant presents the following four questions:

1. Did the Trial Court Err in Granting Appellees' Motion for Summary Judgment on the grounds that there are no genuine disputes as to any material facts and that the Appellees are entitled to judgment as a matter of law?

2. Did the Trial Court Err in Granting Appellees' Motion for Summary Judgment on the grounds that there was no duty of care owed to Mr. Rivers?

3. Did the Trial Court Err in Granting Appellees' Motion for Summary Judgment on the grounds that Mr. Rivers must prove that Appellees were aware of criminal activity similar to the arson that occurred at Mr. Rivers' apartment building on June 19, 2003?

4. Did the Trial Court Err in Granting Appellees' Motion for Summary Judgment on the grounds that even if the [appellees] were in violation of the Prince George's County Fire Code, as alleged, Mr. Rivers must prove it was likely the [appellees] could have prevented the arsonist from starting the fire in the entryway by adhering to the fire code?

Appeal No. 1870 pertains to the court's denial of appellant's motion to enforce a settlement agreement. In his brief, appellant advises that, "[a]fter further consideration, Mr. Rivers hereby withdraws his request that this Court consider the issues surrounding the enforcement of any settlement." Appellant has not presented any argument as to the merits of No. 1870.

For the reasons that follow, as to appeal No. 516, we shall reverse and remand for further proceedings. As to appeal No. 1870, we shall dismiss the appeal. *See* Md. Rules 8–504(a)(5) & 8–602(a)(8).

## FACTUAL AND PROCEDURAL SUMMARY[1]

In the early morning hours of June 19, 2003, an arsonist set fire to the bottom level of the stairwell in an apartment

---

1. The account of the undisputed material facts regarding the fire is drawn from a deposition of appellant submitted as an attachment to

building located at 2619 Southern Avenue in Temple Hills (the "Property").[2] The Property, originally constructed in the 1940s, was part of Oxon Park Apartments, an apartment complex in Prince George's County (the "County") that is owned and managed by appellees. Appellant lived on the second floor of the Property, in Apartment 202. At the time of the incident, appellant was getting ready for work and noticed smoke coming into his apartment over and under the door to his unit. When appellant opened the door, he saw thick, black smoke in the hall. He woke his wife, told her to

---

appellees' motion for summary judgment and to appellant's opposition to the motion.

2. The arson in this case was one of many linked to Thomas A. Sweatt, the so-called "D.C. serial arsonist." Although the parties do not mention Sweatt by name in their briefs, they informed the trial court that the fire was the work of the D.C. serial arsonist.

In a "two-year campaign of terror," between March 2003 and his arrest in April 2005, Sweatt committed a series of residential arsons in Maryland, Virginia, and the District of Columbia. Del Quentin Wilber, "Man Arrested in D.C. Area's Arson Wave," WASH. POST, April 28, 2005, at A1. The fires were generally set in the early morning, "by lighting plastic jugs filled with gasoline, often on porches or just outside doors." *Id.* The fire at issue was listed in contemporaneous reports of fires attributed to Sweatt. *See, e.g.*, Matthew Cella, "Serial Arsonist Suspected in Fire at Northeast Home; Similarities Still Sought in PG, D.C. Blazes," WASH. TIMES, July 1, 2003, at B1.

Upon his arrest, Sweatt admitted "that he picked targets at random, that he typically placed the device near a door because it was more likely to burn at that location and that he was, at times, aware that persons were in the homes at which he set these devices on fire." U.S. Dep't of Justice, Press Release, "Thomas Sweatt Pleads Guilty to 45 Residential Arsons in Maryland, District of Columbia and Virginia Including Two Homicides," at 2 (June 6, 2005). Sweatt was prosecuted in federal court in the District of Maryland for two deaths resulting from the fires; many more people were injured. *Id.* at 1. In June 2005, Sweatt pleaded guilty to two counts of possession of destructive devices in furtherance of a crime of violence, and admitted to setting 45 residential fires. *Id.* at 1–2. He was sentenced in September 2005 to life in prison. U.S. Dep't of Justice, Press Release, " 'Serial Arsonist' Thomas Sweatt Sentenced to Life in Prison for Setting 45 Residential Fires in Maryland, District of Columbia and Virginia," at 1 (Sept. 12, 2005). Sweatt later admitted to having set hundreds of residential fires in the D.C. area over the course of decades, several of which were fatal. *See* Dave Jamieson, "Letters from an Arsonist," WASH. CITY PAPER, June 1–7, 2007, Vol. 27, No. 22.

get dressed, and called 911. Appellant was informed by the dispatcher that the fire had already been reported.

Because smoke was entering the apartment, appellant and his wife decided to escape from the building by way of the building's only stairwell. Appellant descended the stairs first. When appellant reached the landing, his legs caught fire. He pushed his wife back up the steps and ran outside the building, where he attempted to extinguish the fire on his legs by rolling on the ground.[3] According to appellant, when the paramedics arrived, about fifteen to twenty minutes later, "[t]hey cut my pants, and when I looked down, you could see the skin rolled up on my legs.... They couldn't get my tennis shoes off because they melted to my skin." Appellant sustained severe burns to both legs.

On December 19, 2005, appellant filed a "Complaint" against Hagner in the Circuit Court for Prince George's County, containing a single count of negligence. An "Amended Complaint," adding Oxon Park as a defendant, was filed on June 16, 2006. Appellant alleged that appellees "failed to provide or maintain smoke and fire alarms in working order so that [its] tenants would be provided sufficient warning to exit in the event of a fire." Further, he alleged that, on the date of the fire, "means of egress at the Oxon Park Apartment complex were obstructed; the smoke detector in [appellant's] apartment was missing; [and] fire extinguishers were not available in the corridors." According to appellant, appellees owed numerous duties, including "maintain[ing] ... a safe and unobstructed egress by which tenants would be provided a safe and clear passage from the building in the event of ... a fire" and "obey[ing] all local, state, and federal regulations and standards concerning the maintenance [and] management ... of the subject premises." According to appellant, appellees' breach of these duties was the proximate cause of his injuries, which included "severe and permanent injuries to his body ...

---

3. Appellant's wife, "had gotten to another apartment on the first floor, and she was in the window," where she was "found" and rescued by the fire department.

permanent scarring ... medical expenses ... lost income from his employment, and ... pain and discomfort...."

On March 5, 2007, appellees filed a "Motion for Summary Judgment" and a supporting "Memorandum of Fact & Law." They argued that, based on the undisputed facts, appellees "cannot be held liable for the causes of action asserted by [appellant] because the [arson] was not foreseeable and, therefore, [appellees] owed [appellant] no duty whatsoever to prevent the [arson]." Appellees also contended:

> In order to impose a duty on a business premises owner, requiring that he protect individuals upon his premises from the intentional criminal acts of third parties, it must be shown that the incident from which the case arises was foreseeable. Proof of foreseeability requires evidence that the defendant knew or should have known that highly similar criminal activity against persons or property had occurred on the premises previously.... [T]he test as to whether a particular event is foreseeable is determined by evidence of prior, similar crimes committed against individuals lawfully on the defendant's premises, or the premises itself.

> The determination of whether a particular incident was foreseeable, thereby creating a duty on the part of the defendant, is a question of law for the court. Here, there is absolutely no evidence of any prior incidences of arson occurring in Mr. Rivers' apartment building, or even in the apartment complex known as the Oxon Park Apartments, from which a court could deem that this fire, started by a serial arsonist, was foreseeable. Furthermore, no similar incidents were cited by [appellant] in his Amended Complaint, or were testified to at any depositions. Therefore, in the absence of proof of any such prior similar incidents, there can be no duty imposed upon [appellees] whereby they should have precluded the occurrence. Accordingly, [appellees] are entitled to summary judgment. (Internal citations omitted.)

In his "Opposition to Defendants' Motion for Summary Judgment," appellant argued:

> [Appellees'] Motion requests judgment be entered as a matter of law in this case because, they claim, there is an absence of proof of any prior similar incidents and, therefore, there can be no duty imposed upon the [appellees] whereby they should have precluded the occurrence.... The basis for their request for judgment is misplaced.... [T]he facts establish a violation of a statute and a prima facie case of negligence. [Appellees'] negligence is based on their violation of the fire code, not any breach of duty to protect against third party actors as alleged by the [appellees].... When viewing the facts in the light most favorable to the [appellant], there are sufficient facts and reasonable inferences that can be drawn there from, to support his negligence claim. Therefore, [appellant] respectfully requests that [appellees'] Motion be denied.

Appellant attached several exhibits to his "Opposition," including the deposition, affidavit, and report of Bernard Schwartz, a professional engineer and certified fire investigator. Schwartz inspected the Property on behalf of appellant and opined that appellees were negligent for violating the Prince George's County Fire Prevention Code ("Fire Code"), codified at Prince George's County Code (2003), § 11–251 *et seq.* ("County Code"). In particular, he opined that the Property did not have two separate exits, as required by the Fire Code, and this violation was a proximate cause of appellant's injuries. The following excerpt from Schwartz's deposition is relevant:

> [APPELLEES' COUNSEL]: [W]ith respect ... to the number of exits, your testimony is the building only had one and that would have been the front door to the apartment building; is that correct?
>
> [SCHWARTZ]: Yes, sir.
>
> [APPELLEES' COUNSEL]: In your opinion, what measure should have been taken by the owner or manager of the

apartment building to bring the building in compliance with [the Fire Code]?

[SCHWARTZ]: Well, one would be to provide a second exit, but there are other provisions that are acceptable to the code, which could also have been implemented, and that's basically a matter of choice.

\*       \*       \*

[APPELLEES' COUNSEL]: [A]re you aware of any Prince George's County Fire Department or other authority which ever indicated to the owner of manager of the apartment building that they were in violation of a code, and that they needed to do one of several options as it appears in [the Fire Code]?

\*       \*       \*

[SCHWARTZ]: I have seen no reports which specifically state that they were in violation of that criteria by the Prince George's County Fire Department.

\*       \*       \*

[APPELLEES' COUNSEL]: With respect to Section 31.2.4, do you believe, to a reasonable degree of engineering certainty, that the building which Mr. Rivers was in qualified for any of the four exceptions listed under that section?

[SCHWARTZ]: At the time of the fire, no, I do not believe it did.

[APPELLEES' COUNSEL]: How about presently?

[SCHWARTZ]: I did not do a detailed analysis, so presently I still believe it does not.

\*       \*       \*

[APPELLANT'S COUNSEL]: [C]an you briefly state for the record what your opinion is with regard to whether or not [appellees] were negligent as of the date of the occurrence with failing to have more than one exit in the building?

[SCHWARTZ]: Yes, I believe that the codes mandate that two exits be provided. There was only one exit provided, and I believe that the failure to have a second exit was

directly related to the injuries received by Mr. Rivers, that he was forced to exit the building through the only ... method available.

Appellant also attached the deposition of appellees' expert, Stephen Olenick, who opined at his deposition that appellees did not violate the Code:

[APPELLANT'S COUNSEL]: Do you agree that the fire code, in effect in Prince George[']s County in June, 2003, required this particular building to have two separate exits?

[OLENICK]: I do not agree with that.... [The Fire Code], basically, states that ... if you have a building ... that[ ] ... was built in the '40s, [it] was grandfathered in. That, if the Fire Chief—and remember, they were inspecting this every year, at least. If they don't have a problem with this layout, it's ... a legal design to have just the one exit.

\* \* \*

[APPELLANT'S COUNSEL]: ... [H]ave you seen any information which suggests ... that in the opinion of a Fire Chief or his authorized representative, the lack of two separate exits did not constitute a distinct hazard of life or property?

[OLENICK]: Yes.... I believe ... it is implied in each and every one of the inspection reports that we've received from PG County, that they inspected the building. At no time were they ever cited for only having one exit. And, in fact, even after the fire, they were required to put in manual pull stations. They were required to fix up two smoke detectors that were missing in apartments. But, they still did not cite them or ask them to put a second exit in. Clearly, the approval was implied, through those inspections.

\* \* \*

[APPELLANT'S COUNSEL]: Have you seen any documents in this case which suggests the management company, or the owner, applied for a variance from the fire code in Prince Georges [sic] County?

[OLENICK]: I have not. Although, I wouldn't really expect one.... On existing construction, I wouldn't ... expect to see that type of paperwork.

As noted, appellant also submitted as exhibits the affidavit and report of Schwartz. In his affidavit, Schwartz summarized the conclusions of his report, stating:

At the time of the subject fire, the apartment building in which Mr. Rivers resided and was injured was considered "an existing building" under the Code. This building was also considered a four-story building under the Code. The Code required that this building have two exits, remotely located from each other. Remotely located from each other means, among other things, accessible by separate paths of travel and that they must be arranged to minimize the possibility that more than one has the potential to be blocked by any one fire. There were recognized alternatives under the Code whereby the subject building, in lieu of having two exits, would have been in compliance with only one exit if it contained a supervised automatic sprinkler system throughout, if it had a smoke-proof enclosure, or an outside stairway accessible to all living units. This building had only one exit, and met none of the recognized exceptions. Therefore, within a reasonable degree of engineering certainty, the building was maintained in violation of the fire code in Prince George's County at the time of the fire.

\*　　\*　　\*

... I disagree with [Olenick's] opinion that [appellees] were in compliance with the Fire Code pursuant to Section 11–252 of the Prince George's County Code. That part of the Code states the non-compliant conditions may be permitted to continue "only if, in the opinion of the Fire Chief or his authorized representative, they do not constitute a distinct hazard to life or property." I have seen no evidence in this case which demonstrates that the [appellees'] noncompliance with the fire code at the time of the fire was permitted by the Fire Chief or his authorized representative, nor have I seen any evidence the [appellees] applied for a Variance as

contemplated under Section 11–294 of the Prince George's County Code. In addition, ... requirements for existing buildings can be modified by the authority have [sic] jurisdiction (ie.[sic] The Fire Chief or his authorized representative) but only where it is clearly evident that a reasonable degree of safety was provided. Again, I see no evidence the [appellees] ever sought any type of modification of the requirements of the Code or a determination that a reasonable degree of safety was provided in the opinion of the Fire Chief or his authorized representative. (Internal citations omitted.)

At the motion hearing on April 5, 2007, appellees' counsel argued:

In every context of a third-party criminal act, the law's the same. You have to establish, if you're going to sue the business proprietor for negligence, a similar act or acts previously that are highly like the one that you're suing about in order to establish foreseeability. There's no exception. . . . If you're going to hold [a] business owner liable, you['ve] got to show that it happened before so that they're on notice of a likelihood of it happening again. . . . I'll concede everything they say for purposes of today's motion. It doesn't change that element that they have to establish. They've got to show that it happened before. There's absolutely no evidence.

In response, appellant's counsel contended:

[I]t doesn't matter how this fire started, whether it was ... someone falling asleep with a cigarette, an intentional act, a faulty piece of equipment that started a fire. They had an obligation to be in compliance with the fire code, and they were not in this case, and as a result, my client was forced out of the only exit available when they're required under the fire code to have two separate exists [sic] remotely located from each other with two separate paths of trial.

\* \* \*

Your Honor, ... because you have a violation of a statute, that's a prima facie case[ ] of negligence and all we've got

[to] show is that violation was a proximate cause of the injury and in this case if two separate exists [sic] were available to my client, he wouldn't have had to go out the only one that was blocked by the fire.

Subsequently, the court issued a "Memorandum and Order of the Court" (the "Order"), granting appellees' motion for summary judgment.[4] The court said, in part:

In this case, the fire that caused [appellant's] injuries was started by the criminal act of a serial arsonist. The evidence fails to suggest that [appellees] were aware of criminal activity similar to the arson that occurred on June 19, 2003 on the premises of the Oxon Park Apartment building. Therefore, [appellees] were not under a duty to protect [appellant] against such acts. Furthermore, *whether or not the acts or omissions that [appellant] mentions constitute a violation of the Prince George's County Fire Code, it is highly unlikely that [appellees] could have affected the arsonist from starting the fire in the entryway by adhering to the fire code.* Therefore, the Court concludes that there are no genuine disputes as to any material facts and [appellees] are entitled to judgment as a matter of law. (Emphasis added.)

Appellant noted an appeal on May 7, 2007 (No. 516, September Term, 2007). On the same day, appellant filed a "Motion to Stay Time for Appeal," asserting:

[Appellant] has filed Notice of Appeal in order to preserve his appellate rights. However, [appellant] also seeks a reconsideration of the Court's Order granting summary judgment and the Court's consideration of the settlement agreement reached between the parties. In order to preserve the time for [the] court to consider these two matters, the [appellant] moves the Court to stay the time for [appellant] to appeal it's [sic] Order granting judgment.

---

4. The Order was signed by the court on April 6, 2007, and contains a notation that it was mailed to the parties on that date. However, it was not docketed until April 16, 2007.

On May 16, 2007, appellant filed a "Motion for Reconsideration" of the summary judgment Order. The court denied appellant's Motion to Stay Time for Appeal on May 17, 2007, and, after a hearing on the Motion for Reconsideration, it denied that motion on September 7, 2007.

## DISCUSSION

### A

On review of a grant of summary judgment, we "review the record in the light most favorable to [appellant as] the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Educ. Testing Serv. v. Hildebrant,* 399 Md. 128, 140, 923 A.2d 34 (2007). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and . . . the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(f) (2008). Thus, the first task for the reviewing court is to determine whether a dispute of material fact exists; "where such dispute is absent . . . we proceed to determine whether the moving party is entitled to judgment as a matter of law." *Hill v. Knapp,* 396 Md. 700, 711, 914 A.2d 1193 (2007).

"A material fact is a fact that, depending on how it is decided by the trier of fact, will affect the outcome of the case." *Mandl v. Bailey,* 159 Md.App. 64, 82, 858 A.2d 508 (2004); *see also Arroyo v. Bd. of Educ. of Howard County,* 381 Md. 646, 654, 851 A.2d 576 (2004). Put another way, if the court does "not rest [its] decision" upon a particular factual ground, "any dispute as to facts relating [to that ground] is not a dispute with regard to a material fact and does not prevent the entry of a summary judgment. . . ." *Daniel v. Kensington Homes, Inc.,* 232 Md. 1, 13, 192 A.2d 114 (1963). Ordinarily, on review of a grant of summary judgment, an appellate court may " 'uphold the grant of a summary judgment only on the grounds relied on by the trial court.' " *Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 711, 923 A.2d 971

(2007) (citations omitted), *aff'd,* 403 Md. 367, 942 A.2d 722 (2008).

In this case, the court granted summary judgment on the ground that the fire was unforeseeable as a matter of law because it was set by an arsonist. Therefore, in the court's view, it was immaterial whether appellees complied with the Fire Code: Even if they did not comply, the court reasoned, they had no duty to protect appellant from the arsonist's intentional criminal acts. As we shall explain, we disagree.

## B

█ Appellant argues that appellees' alleged violations of the Fire Code breached a duty owed to him and caused his injuries. He states: "Mr. Rivers does not allege in this case that the Appellees had a duty to protect him from the criminal actions of the arsonist. Rather, the duty alleged is a duty to maintain Mr. Rivers' apartment building in a safe condition and ... a statutory duty to comply with the fire code." Appellant relies on *Polakoff v. Turner,* 385 Md. 467, 483, 869 A.2d 837 (2005), in which the Court stated:

> The law in this State regarding the breach of a statutory duty remains the same today as it has for over ninety years. To make out a *prima facie* case in a negligence action based on the breach of a statutory duty, a plaintiff must show "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks [v. Lewin Realty III, Inc.],* 378 Md. [70,] 79, 835 A.2d 616 [ (2003) ]. "Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent." *Id.*

> \* \* \*

> If a landlord of property ... fails to maintain the premises in a safe condition and someone whom the Code was designed to protect ... is injured as a result of the landlord's

failure to maintain the premises [in compliance with the applicable statutes], the plaintiff will have successfully established a *prima facie* case of negligence. It will then be incumbent upon the finder of fact to determine whether the landlord's actions were reasonable under all of the circumstances.

In appellant's view, "[t]he cause of the fire is irrelevant. The fact that it was started by a criminal act rather than a negligent act is also irrelevant." He asserts: "Surely, Mr. Rivers, a tenant in this building, was a member of the class of persons the fire code was designed to protect." According to appellant, "the injury was of the type the ordinance was undoubtedly intended to prevent. Simply put, the potential for the outbreak of fires is the specific emergency for which provisions of the fire code are enacted."

Appellees counter that "business proprietors such as the Appellees are not the insurers of the safety of their tenants." They summarize their view of the law:

> In order to impose a duty on a business premises owner, *requiring that he protect individuals upon his premises from the intentional criminal acts of third parties*, it must be shown that the incident from which the case arises was foreseeable. Otherwise, no duty arises. Proof of foreseeability requires evidence that the defendant knew or should have known that highly similar criminal activity against persons or property had occurred on the premises previously. Only prior criminal acts actually occurring on the same premises are relevant in making a determination of whether the defendant was under a duty to keep the premises safe under the circumstances alleged in the lawsuit.

Appellees cite *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976), as well as several other cases, in support of the proposition that "there is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises." *Id.* at 166, 359 A.2d 548. Rather, as the Court said in *Scott,* a landlord owes its tenants "the duty of reasonable and ordinary care to keep the

premises safe." *Id.* at 165, 359 A.2d 548. The Court explained that the foreseeability of a third person's criminal acts is a factor in determining whether the duty of ordinary care requires the landlord to protect its tenant from harm: "If the landlord knows, or should know, of criminal activity ... he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *Id.* at 169, 359 A.2d 548 (emphasis in original). But, said the Court, *id.*,

> [s]ince the landlord can affect the risk only within his own premises, ordinarily only criminal acts occurring on the landlord's premises, and of which he knows or should have known (and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining, in the particular circumstances, the reasonable measures which a landlord is under a duty to take to keep the premises safe.

Seeking to apply *Scott* and its progeny to the case at bar, appellees argue:

> The Appellant here argues that the Appellees had a duty to prevent his injuries by virtue of the existence of the building code provisions to which he cites.[ ] That argument puts the cart before the horse since the applicable law is clear that before a duty can be imposed upon the Appellees under the circumstances presented here, there must be a showing of foreseeability. Foreseeability is a prerequisite to the existence of a duty in any negligence case. In the absence of foreseeability, there is no duty to act or to refrain from acting. In turn, when a plaintiff seeks to impose liability on a defendant for the intentional criminal acts of a third party with whom the defendant had no relationship, the plaintiff must prove that highly similar acts occurred at the premises of the defendant prior to the incident which gives rise to the litigation in order for a jury question to arise as to the issue of foreseeability. Thus, absent proof of similar acts or events, there is no duty.

Rejecting appellant's reliance on the statutory obligation imposed by the Fire Code, appellees reason: "No duty is created simply by the existence of a statute." They also assert:

> Appellant failed to produce any evidence of any prior criminal incidents similar in nature to that which occurred at Mr. Rivers' apartment building. That evidence was crucial to generating an issue on foreseeability. In the absence of any such evidence, the defendants owed the plaintiff no duty whatsoever to protect him from the crime which underlies this case.

We first consider the applicable statutory scheme. As part of its Fire Code, the County has adopted the "Life Safety Code," also known as "NFPA 101," a standard body of fire protection regulations promulgated by the National Fire Protection Association. *See* County Code, § 11–253(a)(1) (incorporating NFPA 101). At the time of the fire, the 1994 edition of the Life Safety Code was in effect in the County. *See* Prince George's County Res. No. CR–36–1996 (adopted July 23, 1996).[5]

The purpose of the Life Safety Code is "to provide minimum requirements, with due regard to function, for the design, operation, and maintenance of buildings and structures for safety to life from fire and similar emergencies." NFPA 101 (1994 ed.), § 1–2.1. More particularly, "[a]s related to fire safety, the objective of [the Life Safety Code] is to protect the occupants not intimate with the initial fire development from loss of life and to improve the survivability of those who are intimate with the fire development." *Id.*, § 1–2.2. The Life Safety Code "applies to both new construction and existing buildings," and provides "specific provisions for existing buildings that might differ from those for new construction." *Id.*, § 1–4.1.

---

**5.** During the pendency of this case, the County adopted the 2006 edition of the Life Safety Code. *See* Prince George's County Res. No. CR–75–2006 (adopted Nov. 14, 2006).

As a "fundamental requirement," the Life Safety Code mandates, *id.,* § 2–8:

Two means of egress, as a minimum, shall be provided in every building or structure, section, and area where size, occupancy, and arrangement endanger occupants attempting to use a single means of egress that is blocked by fire or smoke. The two means of egress shall be arranged to minimize the possibility that both might be rendered impassable by the same emergency condition.

In addition, the Life Safety Code requires that, "[w]here exits are not immediately accessible from an open floor area, safe and continuous passageways, aisles, or corridors leading directly to every exit shall be maintained and shall be arranged to provide access for each occupant to at least two exits by separate ways of travel." *Id.,* § 5–5.1.2.

As the building in issue was constructed in the 1940s, the particular requirements of the Life Safety Code relating to existing buildings are also relevant. In an existing building, the Life Safety Code requires that "[e]very living unit shall have access to at least two separate exits remotely located from each other. . . ." *Id.,* § 19–2.4. The Life Safety Code provides four exceptions to this requirement. First, a living unit in a building may have access to only a single exit if the exit is dedicated to the living unit (or, in some circumstances, shared with only one other unit), and other conditions apply. *Id.* Second, a building may have only a single exit if it contains "an approved, supervised automatic sprinkler system," and complies with other conditions. *Id.* Third, a single exit is permitted for a building of three stories or less under certain conditions. *Id.* Finally, "[a] building of any height with not more than four living units per floor" is permitted to have a single exit if the exit is "a smokeproof enclosure or outside stair," and there is no more than twenty feet of travel distance between the entrance door of each unit and the exit. *Id.* Of import here, the parties agree that the Property did not conform to any of the exceptions set forth in NFPA 101, § 19–2.4.

■ At the outset, we reject appellees' contention that a duty of care is not created "simply by the existence of a statute." To the contrary, "[a] duty may be, and often, is prescribed by statute." *Brown v. Dermer*, 357 Md. 344, 358, 744 A.2d 47 (2000), *overruled in part on other grounds by Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 72, 835 A.2d 616 (2003); *see Joseph v. Bozzuto Mgmt. Co.*, 173 Md.App. 305, 345, 918 A.2d 1230 (2007). Appellees' reliance on *Scott, supra,* 278 Md. 160, 359 A.2d 548, is also misplaced. *Scott* involved a wrongful death suit brought against a landlord by the relatives of a tenant who was shot to death by unknown persons in the landlord's parking garage. *Id.* at 161–62, 359 A.2d 548. Notably, there was no applicable statute that established a duty of care. The Court's holding was "a subsidiary of the broader rule that a private person is under no special duty to protect another from criminal acts by a third person, *in the absence of statutes,* or of a special relationship." *Id.* at 166, 359 A.2d 548 (emphasis added). And, with the exception of *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 642 A.2d 219 (1994), which we shall discuss in more detail, *infra,* in the other cases cited by appellees none of the defendants violated an applicable statute.[6]

---

**6.** Appellees cite the following cases, none of which involves the violation of a statute: *Henley v. Prince George's County*, 305 Md. 320, 324, 330–40, 503 A.2d 1333 (1986) (whether various defendants had duty to prevent sexual assault and murder committed by former inmate employed as security guard depended on whether defendants had knowledge of convict's intended violent treatment of suspected vandals); *Univ. of Md. Eastern Shore v. Rhaney*, 159 Md.App. 44, 55–60, 858 A.2d 497 (2004) (university had no duty to prevent student from assaulting his dormitory roommate), *aff'd,* 388 Md. 585, 880 A.2d 357 (2005); *Smith v. Dodge Plaza L.P.*, 148 Md.App. 335, 346–55, 811 A.2d 881 (2002) (nightclub had no duty to protect patron from stabbing by another patron), *cert. denied,* 374 Md. 84, 821 A.2d 371 (2003); *Moore v. Jimel*, 147 Md.App. 336, 337, 343–49, 809 A.2d 10 (2002) (because there was no evidence of prior crime against customers on the premises, restaurant could not have foreseen rape of customer in restaurant bathroom and had no duty to prevent it); *Schear v. Motel Mgmt. Corp. of Am.*, 61 Md.App. 670, 688–92, 487 A.2d 1240 (1985) (hotel not liable for theft of patrons' jewelry from hotel room, where hotel complied with "innkeeper's statute," which shields an innkeeper from liability for such theft if innkeeper provides a safe in which patrons may deposit

Thus, the cases on which appellees rely were subject to the general rule, articulated by the *Scott* Court, that "a private person is under no special duty to protect another from criminal acts by a third person. . . ." *Scott,* 278 Md. at 166, 359 A.2d 548. But, where a relevant statute provides the applicable duty of care, the rule is otherwise. As the Court ruled in *Polakoff, supra,* 385 Md. at 476 n. 5, 869 A.2d 837, "[t]he standard for establishing a *prima facie* case of negligence in a statutory-based negligence action is different from the general standard for establishing a *prima facie* case of negligence in cases that are not governed by a statute."

The principle has been long recognized. In *Flaccomio v. Eysink,* 129 Md. 367, 380, 100 A. 510 (1916), the Court stated that "violation of a statute . . . is itself sufficient to prove such a breach of duty as will sustain a private action for negligence." We elucidated the distinction in *Moore v. Myers,* 161 Md.App. 349, 868 A.2d 954 (2005):

> To prevail in a typical negligence action, one must show "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." But, "where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff, . . . the defendant's duty ordinarily 'is prescribed by the statute' or ordinance and that the violation of the statute or ordinance itself is evidence of negligence."

*Id.* at 363, 868 A.2d 954 (citations omitted); *see also, e.g., Polakoff,* 385 Md. at 475–76, 869 A.2d 837; *Horridge v. Saint Mary's County Dep't of Social Serv.,* 382 Md. 170, 182–83, 854 A.2d 1232 (2004); *Brooks,* 378 Md. at 72, 835 A.2d 616;

---

valuables and provides printed notice to patrons of limited liability); *Funk v. Taubman Co.,* 102 F.Supp.2d 308, 311–15 (D.Md.2000) (jury issue of foreseeability generated where mall patrons were attacked by other teenage patrons on a Saturday evening, and mall owner had knowledge of assaults and disorderly conduct which occurred regularly in common areas of mall during weekend evening hours).

*Brown,* 357 Md. at 358–59, 744 A.2d 47; *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 670–72, 645 A.2d 1147 (1994), *overruled in part on other grounds by Brooks,* 378 Md. at 86–89, 835 A.2d 616; *Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232 (1991).

█  Thus, when a plaintiff alleges that a defendant's duty is established by statute, "all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks,* 378 Md. at 79, 835 A.2d 616. As the Court explained in *Brown,* 357 Md. at 359, 744 A.2d 47, once the violation of a statute is shown, "[p]roximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence." (Citations omitted.) *Accord Gourdine v. Crews,* 405 Md. 722, 955 A.2d 769 (2008); *Brooks,* 378 Md. at 79, 835 A.2d 616; *Moore,* 161 Md.App. at 365, 868 A.2d 954.

█  The plaintiff need not show that the defendant had knowledge of the statutory violation (although the statute itself might require knowledge in order to establish a violation). *Brooks,* 378 Md. at 80, 835 A.2d 616. Notably, while "[t]he majority of state courts treat the violation as negligence *per se* ... Maryland is among the minority of states that treat the violation simply as evidence of negligence." *Joseph, supra,* 173 Md.App. at 329, 918 A.2d 1230. Thus, once the plaintiff has presented a *prima facie* case, by introducing "evidence that the violation of the statute proximately caused the plaintiff's injury," the defendant's negligence becomes a question for the fact finder. *Brooks,* 378 Md. at 79, 835 A.2d 616. At that point, "[t]he trier of fact must ... evaluate whether the actions taken by the defendant were reasonable under all the circumstances." *Id.*

*McQuay v. Schertle,* 126 Md.App. 556, 730 A.2d 714, *cert. denied,* 356 Md. 18, 736 A.2d 1065 (1999), illustrates the analysis a court must perform to determine whether "the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent." *See Brown,* 357 Md. at 359, 744 A.2d 47. In *McQuay,* 126 Md.App. at 563, 730 A.2d 714, a motorist was killed "when an eight ton tractor load of wood pulp fell on the parked car in which she was sitting, crushing it." The accident took place on the grounds of the Dundalk Marine Terminal. *Id.* at 564, 730 A.2d 714. The tractor from which the wood pulp fell was being driven between two sheds, along a set of railroad tracks on an industrial road within the terminal. *Id.* at 565, 730 A.2d 714. The decedent, Wozniak, had parked her car at "a point parallel to and immediately adjacent to the railroad track," near one of the sheds, while her boyfriend, who worked at the terminal, went into the shed to pick up his paycheck. *Id.* at 565–66, 730 A.2d 714. The car was in the path of the tractor that was operating along the tracks and carrying a wide load. *Id.* When the tractor's operator saw the car, "[h]e applied his brakes and managed to bring his ... tractor to a halt without hitting the car. The sudden stop caused the tractor to tilt forward, however, and the wood pulp cargo toppled onto the car, crushing it and killing ... Wozniak instantly." *Id.* at 566–67, 730 A.2d 714.

The question before the *McQuay* Court was whether the jury was appropriately charged to consider whether Wozniak was contributorily negligent. In that regard, the *McQuay* Court noted, *id.* at 570, 730 A.2d 714:

> When the accident occurred, Ms. Wozniak's car was situated nine feet from a fire hydrant, one foot from one of the sets of railroad tracks on the industrial road, and in the general vicinity of [a] faded "No Parking Any Time" sign affixed to the west wall of [the shed]. It was also across the industrial road from [a] large warehouse on which a second "No Parking Any Time" sign was posted.

Wozniak had allegedly violated three traffic regulations by parking her car where she did: (1) a "regulation prohibiting

parking within 15 feet of a fire hydrant," *id.* at 578, 730 A.2d 714; (2) a "regulation prohibiting parking '[w]ithin 50 feet of the nearest rail or railroad, except in designated parking areas,' " *id.* at 581–82, 730 A.2d 714 (quoting regulation); and (3) a regulation forbidding parking in posted "no parking" areas. *Id.* at 585–86, 730 A.2d 714. The *McQuay* Court reiterated that the violation of a statute may be evidence of negligence only " 'when it causes harm to a person within the class of persons the statute seeks to protect and the harm is the kind that the statute was designed to prevent.' " *Id.* at 576, 730 A.2d 714 (citation omitted).

The Court then considered the purpose of the three regulations. It determined that neither Wozniak's violation of the fire hydrant regulation nor of the generic "no parking" regulation was a cognizable proximate cause of the accident. *Id.* at 581, 586–87, 730 A.2d 714.

As to the fire hydrant regulation, the Court reasoned: "[T]he purpose of the fire hydrant parking regulation . . . is to provide access to water in case of fire and is not to protect people in Ms. Wozniak's . . . position from injury on the roadway." *Id.* at 578, 730 A.2d 714. Moreover, "the distance in feet from the point at which Ms. Wozniak stopped her car and the nearest fire hydrant had no bearing on the happening of the accident, except in the most random and attenuated way." *Id.* at 580, 730 A.2d 714. The Court explained, *id.* at 580–81, 730 A.2d 714 (citations and footnote omitted):

To be sure, had Ms. Wozniak diligently eliminated all points within a 15 foot radius of the fire hydrant in choosing a spot to park, her car would not have been in the . . . tractor's path. . . . Accordingly, her failure to park at a point that was not more than 15 feet from the fire hydrant may have been a "cause in fact" of the accident—just as the fact that she drove to the marine terminal that day at all was such a cause—in that, "but for" that conduct, the accident would not have happened. It was not, however, a legally cognizable cause of the accident. . . . [T]he proximity of her car to the fire hydrant . . . was irrelevant to the occurrence of the accident. It would be unfair under that circumstance

to permit the jury to draw a legally meaningful link between Ms. Wozniak's violation of the fire hydrant regulation and her death.

Similarly, the Court rejected Wozniak's parking in violation of the generic "no parking" signs as evidence of contributory negligence, stating, *id.* at 586, 730 A.2d 714:

It is clear from the configuration and setting of the loading dock and [the shed], to which the "No Parking Any Time" signs were affixed, and the locations of the signs on those buildings, that they are posted to promote ease of access to the buildings, not to protect drivers or occupants of vehicles on the adjacent roadway from injury or death.

However, the Court reached a different conclusion regarding the regulation prohibiting parking within 50 feet of a railroad. In the Court's view, that regulation was "intended in part to protect occupants of parked cars from serious injury and death that can ensue when parked cars interfere with the movement of vehicles that occupy the rails. This purpose applies whether the vehicle in question is a train or another vehicle using the rail." *Id.* at 584, 730 A.2d 714. Accordingly, the Court determined that violation of the railroad parking regulation could be considered as evidence of contributory negligence. *Id.*

*Manor Inn, supra,* 335 Md. 135, 642 A.2d 219, upon which appellees rely, is also illuminating. In that case, an employee of a hotel, Manor Inn, "parked a laundry van [on the hotel property] leaving it unattended, with the doors unlocked and the keys in the ignition." *Id.* at 139, 642 A.2d 219. The van was stolen by an opportunistic thief, and "[a]pproximately thirty minutes later, [the thief] negligently drove the van into [a] car, which was stopped at a stop sign." *Id.* at 140, 642 A.2d 219. The insurer of the car that was struck sued Manor Inn, contending that the hotel employee's negligence in leaving the vehicle unattended was a proximate cause of the accident. *Id.* To establish the employee's negligence, the insurer cited a provision of the Maryland Code which provided that " 'a person driving or otherwise in charge of a motor

vehicle may not leave it unattended until the engine is stopped, the ignition locked, the key removed, and the brake effectively set.'" *Id.* at 155, 642 A.2d 219 (quoting statute).

The Court considered the purpose of the statute, which it said was "'to protect against a theft of or tampering with a motor vehicle and to prevent [motor vehicles] from moving under their own momentum should the brakes fail.'" *Id.* at 156, 642 A.2d 219 (citation omitted). The Court reasoned that the employee's violation of the statute was a proximate cause of the theft, commenting: "Leaving the keys in the ignition of a motor vehicle increases significantly the chances of that vehicle being stolen. . . . [I]t is patent that it was reasonably foreseeable that, by leaving the keys in the ignition, a thief would take the van." *Id.* at 160, 642 A.2d 219. But, the Court explained, *id.*:

> It is not so clear, however, that the thief would drive negligently, and even more unclear that, in doing so, he or she would injure the plaintiff. Consequently, while the negligence of Manor Inn clearly was the proximate cause of the theft of the van, it does not follow that that causal relationship continued from the moment of the theft to the moment of the impact between the van and [the] car. [The thief's] conduct in taking the van was not "highly extraordinary"; indeed, it was highly predictable. On the other hand, the manner in which he drove the van, and its consequences, were "highly extraordinary."

In this case, appellees' expert, Stephen Olenick, opined that, despite appellees' non-conformance with the requirements of NFPA 101, appellees did not violate the Fire Code. He based his opinion on County Code, § 11–252(a), which provides that the Fire Code

> shall apply to existing conditions as well as to conditions arising after the adoption thereof, except that conditions legally in existence at the adoption of [the Fire Code] and not in strict compliance therewith may be permitted to continue only if, in the opinion of the Fire Chief or his

authorized representative, they do not constitute a distinct hazard to life or property.

In Olenick's view, the fact that the Property had been inspected by County fire inspectors on several occasions and had not been cited for noncompliance with NFPA 101 § 19–2.4 demonstrated that, in the opinion of the Fire Chief, the Property's noncompliance did not constitute "a distinct hazard to life or property."

In contrast, appellant relied below upon County Code, § 11–294, which governs the procedure to obtain a variance from the Fire Code. Section 11–294 provides:

> Upon application in writing, the Fire Chief or his authorized representative is authorized and empowered, when there are practical difficulties or circumstances of undue hardship involved in the implementation and enforcement of the provisions of [the Fire Code], to make such interpretative decisions and qualifications as shall ensure substantial compliance with its terms and avoid the imposition of undue hardship provided that the spirit of [the Fire Code] shall be observed, public safety secured and substantial justice done. The particulars of such variances, when granted or allowed, and the decision of the Fire Chief thereon, shall be entered upon the records of the Bureau of Fire Prevention and a signed copy shall be furnished the applicant.

Appellant maintained that a decision of the Fire Chief or his authorized representative to permit a particular departure from the Fire Code on the grounds that it does "not constitute a distinct hazard to life or property," *id.*, § 11–252(a), must be made in writing according to the variance procedure described in County Code, § 11–294. Appellant asserted that there was no record that appellees received a variance for the Property's non-conformance with § 19–2.4 of the Life Safety Code. Therefore, appellant reasoned that § 11–252(a) of the County Code does not apply.

On appeal, appellees continue to press their interpretation of the Fire Code, reasoning that the Code "requires that the

Appellees retrofit the building with a second exit only if ordered to do so by the fire marshal." They contend:

> In this case, the building was inspected every year and absolutely no mention was made of the need for additional measures with regard to fire safety. The Fire Chief of Prince George's County determined that the Appellee's building was not in violation of any fire code provisions, and therefore did not "constitute a distinct hazard to life or property."

Given the posture of the case, this Court is not empowered to resolve the parties' dispute regarding the interpretation of the Fire Code, nor to make the antecedent factual determinations as to whether the County Fire Chief actually found that it was permissible for the Property not to comply with the Life Safety Code.[7] As noted, on a grant of summary judgment we ordinarily may " 'uphold the grant of a summary judgment only on the grounds relied on by the trial court.' " *Pulte Home Corp., supra,* 174 Md.App. at 711, 923 A.2d 971 (citations omitted). Here, the circuit court granted summary judgment on the ground that the fire was the intentional act of an arsonist and, because appellees were not aware of "criminal activity similar to the arson," they "were not under a duty to protect [appellant] against such acts ... *whether or not the acts or omissions that [appellant] mentions constitute a violation of the Prince George's County Fire Code....*" (Emphasis added.) We shall assume, as the circuit court seemed to do, that appellees were in violation of the Fire Code.[8]

---

7. Even if we could otherwise reach the legal question of the interpretation of the Fire Code, the question of whether the Fire Chief determined that the Property's non-compliance was permitted would be a question of material fact that would preclude the entry of summary judgment.

8. At this procedural juncture, we are unable to address appellees' assertions (raised on appeal, but not below), that appellant "would have been burned by the fire in any event because he had to walk on the landing where the fire was burning *before* reaching the level where he would exit the building." Appellees suggest that the Fire Code's requirement of two exits is "moot," given what they characterize as appellant's "poor choice in even attempting to exit the building...." In their view, "the absence of a second exit was not the proximate cause of

It is patent that appellant is within the class of persons that the Fire Code seeks to protect, and that the injuries he suffered are the kind the Fire Code is intended to prevent. The purpose of the two-exit requirement of the Life Safety Code is to obviate the danger of an apartment building's "occupants attempting to use a single means of egress that is blocked by fire or smoke." NFPA 101, § 2–8. That is exactly what allegedly occurred in this case. It was eminently foreseeable that, if a fire, whatever its origin, blocked the single exit to the Property, the occupants would be burned as they attempted to escape via that exit. That is the precise contingency the two-exit requirement is intended to address.

Despite the existence of the statutory scheme, appellees insist that the fire in this case was not foreseeable because it was set intentionally by a third party. In several cases, Maryland courts have rejected a defense based on lack of foreseeability of a particular fire, when it was the conditions on the property that enabled the fire to injure the plaintiffs, regardless of its cause.

*Collins v. Li,* 176 Md.App. 502, 933 A.2d 528 (2007), *cert. granted sub nom. Pittway v. Collins,* 403 Md. 304, 941 A.2d 1104 (2008), is particularly relevant. In that case, two children were killed, and three others injured, in a house fire that began in a windowless basement room where the five children

the Appellant's injuries as he would have been burned regardless of the existence of a second exit." Again, because the circuit court did not grant summary judgment on this ground, we may not affirm on this basis.

In any event, appellant counters in his Reply Brief that appellees' factual assertions are "a complete fabrication," unsupported by the record below. At the very least, claims appellant, this is a dispute of material fact that would render summary judgment inappropriate. Moreover, because the Life Safety Code mandates that the two required exits be "remotely located from each other," NFPA 101, § 19–2.4, and that "[t]he two means of egress shall be arranged to minimize the possibility that both might be rendered impassable by the same emergency condition," *id.* § 2–8, the mere existence of a second exit might not have brought appellees into compliance with the Life Safety Code, if the second exit could only be reached by the same landing on which appellant was burned attempting to reach the existing exit.

were sleeping. The fire was "caused by a candle … which was being used during an area-wide electrical outage caused by severe thunderstorms." *Id.* at 514, 933 A.2d 528. The decedents were the overnight guests of the Chapmans, tenants of the house. *Id.* at 513–14, 933 A.2d 528. The parents of the victims sued the Chapmans' landlords, the Lis, along with several other defendants. *Id.* at 514, 933 A.2d 528. As to the Lis, the plaintiffs alleged that the relevant local rental ordinances "prohibited the use of the enclosed basement room[ ] as [a] sleeping area[ ] due to the lack of proper emergency egress and smoke detectors in the immediate vicinity," *id.* at 565, 933 A.2d 528, and that the Chapmans used the room as a bedroom "in reliance on the Lis' representations that the enclosed room[ ] could be used as [a] sleeping area[ ]. . . ." *Id.* at 565–66, 933 A.2d 528. The evidence also made "clear that, for at least several minutes, the boys tried unsuccessfully to escape. . . ." *Id.* at 549, 933 A.2d 528.

The circuit court granted the Lis' motion to dismiss on the ground that the Chapmans' negligence in leaving the candle burning was a superseding cause.[9] We reversed, stating: "Quintessentially, the potential for the outbreak of fires is the specific emergency for which provisions requiring that there be emergency egress from residential dwellings are enacted." *Id.* at 566, 933 A.2d 528. Thus, "[n]otwithstanding that the Lis might not have anticipated the Chapmans' specific acts of negligence, the negligent acts of the Chapmans were clearly within the general field of danger as proscribed" by the rental ordinance. *Id.* at 572, 933 A.2d 528.

*Orfanos v. Athenian, Inc.,* 66 Md.App. 507, 505 A.2d 131 (1986), is also instructive. There, "a fire erupted at the Athenian Restaurant … substantially damaging both the restaurant furnishings and equipment and the buildings in which they were housed." *Id.* at 509, 505 A.2d 131. The

---

9. Because the circuit court did not issue an oral or written opinion, we "look[ed] to the arguments set forth in the motion filed by the Lis as the basis for the court's ruling." *Id.* at 528, 933 A.2d 528. The Lis claimed the Chapmans' negligence was a superseding cause. *Id.*

building's owners sued their tenants, the restaurant owners, arguing that the restaurant owners allowed grease to accumulate "in the ventilation system serving the cooking units [which] contributed to the spread and ferocity of the fire and therefore was proximate cause of the ultimate damage suffered." *Id.* at 513–14, 505 A.2d 131. The circuit court entered judgment in favor of the restaurant owners, reasoning that "because [the landlords] failed to show how the fire started, they failed in their burden of proving the requisite element of foreseeability." *Id.* at 514, 505 A.2d 131. We rejected this conclusion, however, stating: "Proof of foreseeability does not depend on proof of how the fire started." *Id.* We elaborated: "It is reasonably foreseeable that a fire can start in the kitchen of a restaurant; such fires are not infrequent. Although the precise cause of a particular fire may be unusual, improbable, even unpredictable, the general danger is apparent and therefore foreseeable." *Id.* at 518, 505 A.2d 131.

Appellees seek to distinguish this case from *Collins* and *Orfanos* on the ground that the fire in this case was the intentional, criminal act of a third party, while the fires in the cited cases were the result of negligence. In the context of the claims asserted here, this is a distinction without a difference. Indeed, the cause of the fire is the proverbial red herring. As appellant aptly states: "The jury could reasonably conclude, based on the evidence presented, that Appellees should have foreseen the danger to their tenants posed by fire, regardless of how the fire was started. The risk of fires is reasonably foreseeable." Similarly, in the words of the *Collins* Court, 176 Md.App. at 572, 933 A.2d 528, a fire code is "designed, not just to protect residents from fires ignited by acts of God and where there is no human error, but from *fires regardless of origin.*" (Emphasis added.)

██ As we see it, appellees and the circuit court misapprehended the nature of appellant's claim, which was not based on a duty, if any, to prevent the arsonist from setting the fire, but rather on a duty to maintain the Property so as to minimize the danger to its occupants from fires that might

occur. In appellant's words, "[t]his is not a negligent security case." For this reason, the circuit court's statement that "it is highly unlikely that Defendants could have affected the arsonist from starting the fire in the entryway by adhering to the fire code" was beside the point. A building owner who fails to comply with a fire code runs the risk that, if a fire should occur—regardless of the cause—an occupant will be injured as a result of the building's statutory non-compliance. In such a case, the owner's liability does not arise from failure to prevent the fire from occurring. Rather, the question is whether the occupants' inability to escape from the fire was the foreseeable result of the owner's statutory noncompliance.

*Manor Inn,* cited by appellees, demonstrates that injuries stemming from a third party's intentional, criminal act may be the foreseeable result of negligence. In that case, as noted, a hotel employee left a van unattended and unlocked with the keys in the ignition, in violation of an applicable statute. A thief stole the van, and while driving it, subsequently struck another vehicle. To be sure, the relationship between the statutory violation and the *traffic accident* was so attenuated that the hotel was not liable for the accident. But, the *Manor Inn* Court explicitly stated that "the negligence of Manor Inn clearly was the proximate cause of the *theft of the van....*" *Manor Inn, supra,* 335 Md. at 160, 642 A.2d 219 (emphasis added). The risk that the van might be stolen was a foreseeable consequence of violating the unattended vehicle statute. In this case, the risk that appellant might be injured while attempting to escape a fire in the building was a foreseeable consequence of failure to comply with the provisions of the Fire Code at issue. The nature and foreseeability of this risk is no different, whether a given fire is set intentionally or unintentionally.

Although we have not found a reported Maryland case discussing whether a landlord who does not comply with a fire code may be liable for injuries resulting from an intentionally-set fire, our conclusion is consistent with the decisions of courts in other jurisdictions. *Concord Florida, Inc. v. Lewin,* 341 So.2d 242 (Fla.Dist.Ct.App.1976), *cert. denied,* 348 So.2d

946 (Fla.1977), cited by appellant, is particularly persuasive. In that case, "a madman ran in the front door of the crowded Concord Cafeteria . . . threw a five gallon container of gasoline on the floor, lit a match to the gasoline and then ran away." *Id.* at 243. The cafeteria caught fire and "many patrons . . . were burned [or otherwise] injured in their chaotic attempts to flee the burning building." *Id.* The owner of the cafeteria had failed "to provide ample emergency fire exits . . . to clearly designate the location of the present fire exits and . . . to provide a reasonably safe place for its patrons—all in violation of the [local] Fire Prevention and Safety Code." *Id.*

In the tort suit that followed, the cafeteria owner argued that the "criminal act of the madman" was an intervening cause of the patrons' injuries, but the Florida court disagreed. *Id.* at 243–44. In reasoning we find instructive, the *Concord* Court explained, *id.* at 245:

> [T]he risk created here was not that of an arsonist or madman *setting fire* to a building, per se, but rather, the risk of *fire,* itself. In failing to adequately protect its patrons from fire by providing proper safety measures such as emergency exits and signs indicating the location of said exits, [the cafeteria owner] assumed the foreseeable risk that fire might someday trap its patrons leaving them without an escape route. (Emphasis in original.)

Numerous cases are to similar effect. *See, e.g., Mozer v. Semenza,* 177 So.2d 880, 883 (Fla.Dist.Ct.App.1965) (where hotel guests were injured in arson, "[t]he scope of [hotel's] duty to maintain reasonably safe premises does not include a duty to foresee a particular fire, but it does include a duty to reasonably guard against the risk of fire"); *Williams v. Johns,* 157 Mich.App. 115, 403 N.W.2d 516, 518–19 (1987) (where origin of arson was combustible material stored by landlord in stairwell, landlord "knew or should have known that someone might accidentally or intentionally start a fire in the combustible material"); *Burns v. Prop. Servicing Co.,* 276 S.W.2d 177, 181 (Mo.1955) ("[I]t was wholly immaterial whether the fire in question had its origin in accident, act of God, negligence or wilful, intentional and wrongful conduct; . . . when the defen-

dant ... failed to provide a fire escape in compliance with the statute it could reasonably have foreseen that a fire might occur in the building which would cause injury to a tenant."); *Derboven v. Stockton*, 490 S.W.2d 301, 305 & 316–18 (Mo.Ct. App.1972) (where tavern exit door opened inward, rather than outward, contrary to fire code requirement, and the bodies of patrons who were killed attempting to escape arson in tavern were found " 'piled' against the ... door," statutory violation was evidence of tavern owner's negligence); *Ohio Fair Plan Underwriting Ass'n v. Arcara*, 65 Ohio App.2d 169, 417 N.E.2d 115, 119–21 (1979) (where owner of vacant house violated housing code by failing to "secure[ ] and board[ ] up [house] to prevent vandals or arsonists from entering," owner's liability for damage to neighboring house caused by arson originating in owner's vacant house was question for the jury).

Indeed, appellees have not cited any case to the contrary. We have found one, *Zanders v. Lambert*, 514 So.2d 617 (La.Ct.App.1987), *cert. denied*, 515 So.2d 1109 (La.1987), but it is both distinguishable and unpersuasive. In that case, the Louisiana court determined that an apartment building owners' failure to comply with fire code requirements could not be introduced as evidence of the owners' negligence in a wrongful death suit brought by the survivors of tenants killed by the act of an arsonist. *Id.* at 617–19. Some of the fire code regulations cited by the plaintiffs did "not apply to the defendants' building." *Id.* at 620. Moreover, under the facts of that case, the "arsonist intended to set fire to an entire side of the apartment building...." *Id.* at 619. The court reasoned: "It could reasonably be concluded that if there had been a second stairway, the arsonist would have set fire to that means of escape also." *Id.* In contrast, appellees have advanced no evidence that the arsonist in this case intended to set multiple fires.

Most important, the *Zanders* Court's statement that "the cause of the fire and resulting deaths was arson, not the lack of a second stairway," *id.*, is unconvincing, as this case illustrates. Under the alleged. facts of this case, a fact-finder could decide that appellant would not have been injured while

escaping the arson but for the fact that the fire blocked the sole exit to the building. As we have seen, it is precisely this eventuality that the two-exit provision of the Fire Code is intended to guard against. The existence of the Fire Code is a reflection of the fact that residential fires are foreseeable; the County enacted the Fire Code to require owners of apartment buildings to provide for the safety of their tenants in the event of fire.

In sum, we have little difficulty in concluding that the undisputed facts alleged by appellant stated a *prima facie* case of negligence. In granting summary judgment to appellees on the ground asserted by appellees, the circuit court erred as a matter of law.

**APPEAL DISMISSED IN CASE NO. 1870. JUDGMENT REVERSED IN CASE NO. 516, AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ALLOCABLE TO CASE NO. 1870 TO BE PAID BY APPELLANT. ALL OTHER COSTS TO BE PAID BY APPELLEES.**